(No. 35763

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* THEODORE ROBINSON, Plaintiff in Error.

*Opinion filed May 19, 1961.*

LEAH I. BROCK, of Chicago, (ALICE D. JOHNS, of counsel) for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and JOHN T. GALLAGHER, and LEO F. POCH, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

At a bench trial in the criminal court of Cook County, the defendant, Theodore Robinson, was convicted of murdering Flossie Mae Ward and was sentenced to the peni-

tentiary for the term of his natural life. Upon writ of error he now contends that: (1) he was denied due process of law when the trial court failed, of its own volition, to summon a jury to determine his sanity at the time of trial; (2) the People failed to overcome the proof that he was insane at the time the murder was committed; and (3) his constitutional rights were further violated when the court refused to permit him to subpoena a material witness.

The decedent had known defendant since 1955 and had lived with him as his wife for some time prior to the homicide, despite the fact she was then legally married to another man. Defendant called regularly at the Chicago restaurant where decedent was employed as a night waitress and usually escorted her home from work. Approximately one week before the murder, the decedent's legal husband also appeared at the restaurant and the two men had a heated argument over the woman's affections. On the night of February 28, 1959, decedent was working as usual and at about 10:30 P.M. defendant entered the restaurant door with a revolver in his hand. He was admonished by decedent not to "start anything tonight," but according to those present defendant jumped over a counter, rushed towards the victim and fired into her body, inflicting wounds which caused her death.

Neddie Batts and Jim Hackman, other restaurant employees, testified they were present and saw defendant fire the fatal shots. Clarence Starr, a Chicago police officer, told of arresting defendant and finding the murder weapon in defendant's coat pocket shortly after the arrest, while another officer, Robert Breckenridge, testified as to the police lineup at which the eye witnesses had identified the defendant.

The defendant did not testify in his own behalf. However, his mother, Willie Peterson, related he had been struck in the head with a brick when he was seven years old and thereafter "acted a little peculiar but not enough

that I took time out to see about him because I had to work." She further stated defendant had entered the military service in 1945 and that, on one occasion while home on furlough, he had kicked a hole in a family bar for no apparent reason. She said he was sullen and frequently complained of headaches after he returned from military service, that he would not consult a doctor, and that he was admitted to the Kankakee State Hospital in 1951 where he remained some six to seven weeks. About a year later, while separated from his wife, defendant fatally shot their baby and attempted suicide, after which he was tried and confined to the penitentiary until September, 1956. Thereafter, according to his mother, he became involved in many fights and she signed complaints against him in 1958 and February, 1959, but he was not arrested by the police. Based upon such facts, it was her opinion that defendant was insane and didn't know right from wrong. On cross-examination she testified that her son started drinking heavily after he got out of the service and that when he acted strangely, sometimes he would be drinking and sometimes not.

A friend of the family, Alice Moore, also testified to the occasion when defendant was home on furlough from the service, fourteen years before the trial, and said that she observed the hole he had kicked in the bar, and that when she tried to talk to him he either sat with his head down staring at the floor or looked at her glassy-eyed. Based upon the incident, the witness expressed an opinion that defendant is insane "when he is in those moods."

Defendant's grandfather, William Langham, testified that the former had not been right since he got out of the service, that he often walked away abruptly from his work as a painter and appeared in a daze, and that on one occasion defendant had quarrelled with his wife (defendant's) and threatened to burn her clothing. He said he had seen defendant a few days before the murder of Flossie Mae Ward, that he noticed nothing unusual, and that de-

fendant was then just giddy as always, "carrying on a little fun." It was his opinion that defendant was insane and that he had been partly insane at all times.

Helen Calhoun, defendant's aunt, stated she had observed unusual conduct on the part of defendant just prior to his admittance to the State Hospital at which time he was "stary-eyed" and afraid someone was going to kill him and the witness. She also related that defendant had shot the baby in her apartment and that, just prior to that crime, he was sick, prancing, nervous, and "just staring wild." The witness also testified defendant had lived in her house from November, 1956, to January, 1957, and was very nervous during that period. Based upon the incidents to which she testified, it was her opinion that defendant was presently mentally sick.

The medical record from the Kankakee State Hospital, which was admitted into the record by stipulation, set forth that defendant had been drinking heavily when admitted; imagined he heard voices and saw snakes, elephants and other animals, and thought he was going to be physically harmed. The record further indicated that defendant thereafter gained insight into his condition, tried to cooperate, and that he had recovered from his illness when discharged. Also noted in the report was that defendant had kicked the hole in his mother's bar because she had refused to give him money. It was also stipulated that defendant was adjudged sane by a restoration proceeding in 1953, and that if Dr. William Haines, director of the Behavior Clinic of the Criminal Court of Cook County, was called as a witness, he would testify that defendant knew the nature of the murder charge against him and was able to co-operate with his counsel in the defense to such charge.

The trial, adjudication, or sentence of a person charged with a criminal offense, while insane, violates his constitutional rights and is also expressly prohibited by statute. (*People* v. *Bender, 20* Ill.2d 45; Ill. Rev. Stat. 1959, chap.

38, par. 593.) We have thus held that if, before or during trial, facts are brought to the attention of the court, either from its own observation or by suggestion of counsel, which raise a *bona fide* doubt as to a defendant's present sanity, it becomes the duty of the court to impanel a jury to determine whether the accused is capable of understanding the nature of the charges against him and of co-operating with his counsel. (*People* v. *Burson,* 11 Ill.2d 360.) *Bona fide* doubt is not necessarily raised, however, by the mere revelation that an accused had been declared a psychopath some years prior, (*People* v. *Zerba,* 20 Ill.2d 269,) nor by a prior adjudication of mental illness, unless it appears that the insanity was of a permanent and continuing nature. (*People* v. *DePompeis,* 410 Ill. 587.) Similarly, depravity of character, abandoned habits, or the commission of an atrocious crime are not in themselves evidence of insanity. *People* v. *Spencer,* 264 Ill. 124.

In the present case there was no request by defendant or his counsel for a sanity hearing, nor in our opinion were the facts brought to the attention of the court such as would raise doubt of defendant's sanity and require the court to hold an inquiry into his mental condition. There is no proof in this record that the traits, conduct and crimes of defendant are true manifestations of insanity, and it cannot escape notice that the conclusions of the defense witnesses that he was insane at the time of trial were based largely upon incidents occurring many years before the trial. Such incidents had little, if any, relevancy to defendant's condition at the time of trial and must be viewed in light of the witnesses' family relationship with defendant. Although the court was aware that defendant had spent six or seven weeks in a mental hospital eight years prior to trial, the medical records indicated his illness was a temporary condition resulting in part from alcoholism, he was discharged from the hospital as recovered from his condition, and, in fact, defendant was fully restored by a proceeding six years

prior to his trial. Furthermore, in considering whether any duty devolved upon the court, it is to be remembered that the court had before it a stipulation that the director of the court's Behavior Clinic would testify that defendant knew the nature of the charges against him and was capable of co-operating with counsel in the defense against such charges.

In the latter respect, the record reflects several instances where defendant displayed his ability to assist in the conduct of his defense in a reasonable and rational manner. Typical instances of when defendant displayed mental alertness, as well as understanding and knowledge of the proceeding, appear in his remarks to the court as follows: "Your honor, they were on the State's witness list and the State said they have several witnesses. They produced two. For what reason, I don't know, but I am on trial here and I would like to be given every consideration, and I would like that the court be adjourned until tomorrow morning—to give me time to confer with counsel for the calling of witnesses." Again, when discussing witnesses with the court, defendant said: "Well, the police are contending that the clothes they have found in Moore's apartment was mine. That is the reason at the beginning of trial, I asked the attorney to have a pre-trial preliminary to determine the admissibility and validity of the evidence that the State was intending to use against me."

Under all the circumstances, we are of the opinion that the court violated no duty, and denied defendant no constitutional right, when it did not, of its own volition, require a sanity hearing.

Turning next to defendant's contention that the People failed to overcome the proof that he was insane at the time the homicide in this case was committed, it is a basic principle that the law presumes all men to be sane and, in the absence of contrary proof, that no duty rests upon the prosecution to produce evidence in such respect. However, if

the defense brings forth proof which is sufficient to create reasonable doubt and overcome the presumption of sanity, it is then incumbent upon the prosecution to prove beyond a reasonable doubt that the accused had sufficient mentality at the time of the crime to distinguish and choose between right and wrong. (*People* v. *Patlak*, 363 Ill. 40; *People* v. *Haupris*, 396 Ill. 208.) Defendant's present contention assumes that his proof raised a reasonable doubt as to his sanity. However, as we have already pointed out, we do not agree that this is so, particularly in view of the absence of proof that his prior mental condition, induced largely by alcoholism, was of a permanent or continuing nature. Considering the entire record, it is our opinion that the evidence presented by the defense was insufficient to overcome the presumption of defendant's sanity. This being so, it was unnecessary for the prosecution to affirmatively prove it. *People* v. *Jones*, 6 Ill.2d 252; *People* v. *DePompeis*, 410 Ill. 587.

We likewise find no merit to defendant's remaining contention that the court "refused" to permit him to subpoena a material witness. It appears from the testimony of police officers that defendant's gun was recovered from the pocket of a coat found in an apartment occupied by one Fred Moore, and that defendant had admitted the coat was his. At the conclusion of the People's evidence and before any defense testimony was given, defendant stated to the court that he had requested his attorney to subpoena Moore and his wife but that counsel had failed to do so. Upon being questioned by the court, defendant admitted he had no idea as to what the witnesses would testify to, but that he nevertheless wanted them to be subpoenaed. When the court pointed out that a subpoena would not issue unless it was known what the witnesses would testify to, defendant's counsel intervened to state that he did not recall being asked to subpoena the Moores and proposed that he would discuss the matter with his client at a forthcoming recess. Defend-

ant agreed, and we do not find that the request was ever pursued further. The controlling statute does provide that it shall be the duty of the clerk to issue subpoenas upon request, (Ill. Rev. Stat. 1959, chap. 38, par. 735,) but we find nothing in this record to indicate that such duty was violated or that defendant was refused the benefits of the statute. There was never a showing made that the witnesses desired were material to the defense and, furthermore, for all that appears in the record, defendant's counsel considered the matter and concluded that the witnesses were neither necessary nor helpful to the defense of the case. Under the circumstances, defendant has no cause to complain. Cf. *People* v. *Gambino,* 12 Ill.2d 29.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*