[Crim. No. 9339. In Bank. Apr. 27, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT EUGENE PENNINGTON, Defendant and Appellant.

510

J. Perry Langford, under appointment by the Supreme Court, and Langford, Langford & Lane for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, C. Anthony Collins and Philip M. Rosten, Deputy Attorneys General, for Plaintiff and Respondent.

PETERS, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of the Superior Court of Imperial County, after trial before a jury, on verdicts finding

defendant guilty of murder in the first degree (Pen. Code, §§ 187, 189), finding that he was sane at the time of the crime (Pen. Code, § 1026), and imposing the death penalty (Pen. Code, § 190). Defendant was also convicted of felony child stealing of his 10-year-old victim (Pen. Code, § 278), of lewd and lascivious conduct with a child under age 14 (Pen. Code, § 288), and of unlawfully furnishing drugs to a minor (Bus. & Prof. Code, § 4234).[1]

We have concluded that the judgment must be reversed in its entirety because under the rule established by *Pate v. Robinson*, 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836], defendant was improperly denied a hearing to determine if he was sufficiently competent and sane to stand trial.

Defendant entered pleas of not guilty and not guilty by reason of insanity. Trial commenced, with the impaneling of a jury, on May 24, 1965. When the prosecution began presenting its case, defendant on occasions interrupted the trial with comments or curses. At the beginning of a session of trial held outside the presence of the jury June 16, 1965, defendant announced to the court that he refused to have a lawyer. When defendant broke into curses a recess was called and, later, a continuance was granted. Thereafter, defense counsel moved the court to suspend the trial pursuant to section 1368 of the Penal Code and to conduct a hearing on the issue of defendant's present sanity.[2] In support of this motion

---

[1]The indictment, returned March 23, 1965, in one of its charges, accused defendant of furnishing unlawfully to a minor hypnotic dangerous drugs in violation of section 4234 of the Business and Professions Code. Amendments to that section effective in September 1965 make it inapplicable to the particular allegations. That section was superseded by a new section of the Health & Saf. Code, § 11913, which proscribes the same offense formerly covered by section 4234 of the Bus. & Prof. Code. The new enactment does not reduce the penalty for violation (compare Pen. Code, § 18, with Health & Saf. Code, § 11913) so that the principle of *In re Estrada*, 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948], does not apply.

Three other charges in the indictment, kidnaping (Pen. Code, § 207), forcible rape (Pen. Code, § 261, subd. (3)), and rape of an unconscious female (§ 261, subd. (5)), were dismissed at trial to avoid verdicts inflicting double punishment.

[2]Section 1368 provides: ''If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined, and the trial jury in the criminal prosecution may be discharged, or retained, according to the discretion of the court until the determination of the issue of insanity.''

defense counsel submitted an affidavit of a clinical psychologist, Edward J. Sussman, who had examined defendant and concluded he was at that time insane.

The trial judge then took evidence to aid him in determining if he should declare that a doubt existed as to defendant's competence to stand trial. (See *People* v. *Ashley,* 59 Cal.2d 339, 363 [29 Cal.Rptr. 16, 379 P.2d 496].) Mr. Sussman testified for the defense. He stated he was a senior psychologist at Metropolitan State Hospital in Norwalk and had held this post for five and a half years. Prior thereto he had served as senior psychologist at Atascadero State Hospital for three years. He had a masters degree in psychology from New York University and had studied three years at the University of Southern California towards a doctorate degree. He was certified as a psychologist by the state and had 10 years' practical experience in clinical psychology. Sussman stated that in his opinion defendant was incapable of understanding the nature of the proceedings against him and of assisting his attorney in his defense. He based this opinion on observations of defendant in the courthouse that same day, a 10-to-20-minute examination of defendant that morning, and previous contact he had had with defendant in 1958 when he had treated defendant as a patient at Atascadero State Hospital. In 1958 Sussman had diagnosed defendant as probably schizophrenic and he had predicted homicide and suicide by defendant. He found defendant's condition in 1965 more paranoid in character than his schizophrenia at Atascadero. Sussman testified that when he examined defendant that morning he had observed inappropriate laughter, a symptom of schizophrenia. Defendant had told Sussman then that he, defendant, was hearing voices (hallucinations), and Sussman believed defendant was telling the truth. Sussman stated he had observed defendant go into a fit of "psychotic furor" in the courthouse earlier that day while trial was in progress. A fit of psychotic furor, he explained, was a maniacal and venomous outburst of violence of short duration, rarely longer than an hour. Defendant's fits of psychotic furor, Sussman said, were probably the result of delusions and fantasies. It was typical of the schizophrenic to be restrained one moment and violent the next. Defendant could not possibly be feigning these outbursts, Sussman concluded. Sussman's testimony also disclosed that defendant had been treated by a psychiatrist in the Midwest in the 1960s. Defense counsel stated that this psychiatrist, Dr. John A. Larson, had also examined

defendant and had concluded that defendant was incompetent to stand trial. Defense counsel said he would call Dr. Larson to testify but for the fact that Larson would only echo Sussman's conclusions.

Defense counsel also told the judge, "[T]his man [defendant] is not able to cooperate with me. . . ." While the prosecuting attorney was arguing in opposition to the motion, defendant interrupted. The judge threatened to have defendant gagged. Defendant then broke into obscenities and oaths and four deputies subdued him and attempted to gag him. A recess was granted.

When court reconvened, the judge announced that he had ordered defendant gagged and that the motion for a sanity hearing was denied. The judge said he had no doubts that defendant was capable of understanding the nature of the proceedings and assisting in his defense. The next day of trial the attorneys reargued the merits of the motion for a sanity hearing. Defense counsel told the court he had discovered defendant weeping in his jail cell with abrasions on his wrists and that defendant had again been suffering the hallucination of voices speaking to him. Defendant had also been observed displaying his penis to spectators at the trial and shouting to the spectators to come and bring Cracker Jack.[3] Defense counsel offered to place in evidence medical reports on defendant from Atascadero in 1958. The judge stated, "This proceeding is not to try the sanity or insanity, but to determine whether or not this Court has a doubt, and this Court does not have a doubt and has not had a doubt." The judge explained that he denied the motion for sanity hearing primarily on the basis of reports of four court-appointed psychiatrists, all of whom found defendant to be presently sane, and on the basis of his own observations of defendant during the trial. The judge told defense counsel he need not make another motion for sanity hearing. The judge correctly explained that it was his duty to examine all evidence and other indications pointing to possible present insanity of defendant until sentence was pronounced and to order a sanity hearing on his own motion if a doubt did arise. After sentencing, the judge stated he had never during the entire proceedings doubted defendant's mental competence.

---

[3] Cracker Jack was in issue at the guilt trial. Experts had been unable to identify a substance in the young victim's body until appellant stated in his confession that he had fed the girl Cracker Jack before killing her.

During the remainder of the trial, evidence that defendant was presently insane was forthcoming. The psychiatrist, Dr. Larson, testified that in his opinion defendant was incapable of assisting in his defense and that his mental condition at trial was worse than it had been when appellant was a patient of Dr. Larson at a prison mental hospital in Iowa in 1961-1962. Dr. Larson stated that defendant was markedly hallucinating—hearing voices—and that he was not feigning these symptoms.[4] Larson also reviewed defendant's medical history of schizophrenia paranoid, including Dr. Larson's own previous diagnoses. The doctor found defendant at the time of trial suffering from an acute mental sickness in which he was delusional and out of contact with reality. He stated defendant was hearing voices in the courtroom, frequently the voice of the devil. Dr. Larson also testified that head injuries to defendant may have resulted in brain damages which could be responsible for his recurring long headaches during which he experienced the hallucination of seeing green lights.

Dr. Robert G. Kaplan, a consulting psychologist, testified as to the results of psychological tests he administered during the weeks of trial and reported an interview he had with defendant. He stated that defendant was, during the trial, actively hallucinating and grossly insane and that defendant heard voices and imagined being visited by a dead grandmother and by the devil, hallucinations which reduced defendant to tears. Dr. Kaplan stated that defendant's head injuries caused such headaches that defendant could not rationally speak. Dr. Kaplan considered it extremely probable that injuries to defendant's head had caused brain damage. He stated that defendant was not feigning his mental condition.[5]

---

[4]It was brought out that Dr. Larson is nationally known for his studies on lying and malingering, and that he had written a book on this topic.

[5]The following testimony by Dr. Kaplan is illustrative of the defense evidence of defendant's insanity at the time of trial. The questions are by Dr. Kaplan, defendant responding.

" 'Did the Devil talk to you today?'
" 'I heard him this morning when I first got up.'
" 'Does he talk to you every day?'
" 'Just when I talk to people. He makes my head go around real fast so I can't explain things when I talk.'
" 'When somebody makes people ——'
" 'When people make fun of me and makes people laugh at me.'
" 'What did he say to you?'
" 'He said I was going to die.'
" 'Why?'
" 'Because he said I was no good.'
"At this point he broke out in tears.

There was also further evidence of sanity. The court-appointed psychiatrists repeated some of their findings on the witness stand. Defendant's outbursts in court revealed that he was well aware of the nature of the proceedings at various moments. He made several lucid comments, including giving thanks to the jury for each verdict they brought in against him.[6]

The leading case dealing with section 1368 is *People* v. *Merkouris*, 52 Cal.2d 672 [344 P.2d 1], certiorari denied 361 U.S. 943 [4 L.Ed.2d 364, 80 S.Ct. 411]. (See also *People* v. *Lindsey*, 56 Cal.2d 324 [14 Cal.Rptr. 678, 363 P.2d 910].) In *Merkouris*, the defendant had previously been found insane at a section 1368 hearing. He was hospitalized at Atascadero and then released, certified as sane. At the trial the defense attorney stated that defendant was incapable of cooperating in his own defense, and pointed out to the court defendant's peculiar conduct in the courtroom. Two psychiatrists reported defendant was sane, and the court had before it the certification by Atascadero authorities. No psychiatrist testified that defendant was insane.

The opinion states: "A defendant is sane, within the meaning of section 1368 of the Penal Code, if he is able to understand the nature and purpose of the proceedings taken against him and to conduct his own defense in a rational manner." (*People* v. *Merkouris, supra,* 52 Cal.2d at p. 678;

---

". . . . . . .

"[At a later interview] 'Did the devil talk to you today?'

" 'No. He's mad at me because he came and told me I didn't want to see him any more, so he didn't hurt those people and he was going to take me away with him. He liked me. I would do it in my mind what I wanted to do to them and he would do it, but he didn't, and I don't like him because he lied to me.'

" 'Do you see the devil?'

" 'I see the devil. He's there. He has real nice eyes; has curly hair, and he has little horns, and he said he liked me, and I like him. He'd do things if ——'

"And then he stopped. And then he continued on.

" 'My grandmother came to see me and told me my mother was going to die and asked me if I wanted to go with her.'

"I indicated, 'Your grandmother is dead.'

" 'She came and saw me, grandmother.' "

[6]The following comment by defendant is illustrative of his awareness of the proceedings: "I never wanted a lawyer. I never asked for a lawyer. I asked —— the Judge asked me if I wanted a lawyer, and I said it was up to him, if he wanted to give me one, he could give me one. . . . If he wants to set here and do all this, I don't care what he does, as far as I am concerned, if the District Attorney wants to send me to —— wants to send me to the gas chamber, I'll take him right now. He's not hurting me, he's doing me a favor. That is what I want."

accord, *People* v. *Jensen,* 43 Cal.2d 572, 576 [275 P.2d 25]; *People* v. *Brock,* 57 Cal.2d 644, 648-649 [21 Cal.Rptr. 560, 371 P.2d 296].) This is obviously correct. M'Naughton insanity is immaterial. In the instant case the jury could properly have agreed, and did so, that defendant knew the difference between right and wrong and knew the nature of his acts when he killed his young victim. ▆ On the other hand, there was testimony not directly contradicted that defendant was, at a particular session of the trial, in such a condition of psychotic furor that he was out of touch with reality. It was also reported that during actual sessions of trial defendant was hearing voices of the devil. If, while defendant was hearing voices or while he was out of touch with reality in a state of psychotic furor, a prosecution witness were testifying, defendant would be incapable of paying attention to the testimony and thus be unable to signal his attorney as to those portions of testimony which were inaccurate. Without such assistance from the client, a defense attorney's cross-examination is obviously defective.

▆ The *Merkouris* opinion continues: ''The 'doubt' referred to in section 1368 of the Penal Code, requiring a determination of a defendant's sanity if doubt arises during the pendency of the action or prior to judgment, is doubt in the mind of the trial judge, rather than in the mind of counsel for the defendant or any third person. [Citation.]

▆ ''The determination of a motion for a hearing upon the issue of a defendant's sanity at the time of trial is one which rests within the sound discretion of the trial court. [Citations.] ▆ It is only where as a matter of law a 'doubt' may be said to appear or where there has been an abuse of the discretion that is vested in the trial judge, in the determination of the question, that the conclusion of the latter may properly be disturbed on appeal.'' (52 Cal.2d at pp. 678-679.)

Applying those rules to the particular facts of the *Merkouris* case the opinion states: '' [T]he evidence on the subject of defendant's sanity was highly conflicting and, together with the trial judge's personal observation of defendant, was sufficient to support his conclusion that he did not have a doubt as to defendant's sanity at that time.'' (52 Cal.2d at p. 681.)

▆ Defendant contends that insofar as the procedure approved in *Merkouris, supra,* permits a trial judge to resolve conflicting evidence against a doubt of present insanity, it is unconstitutional as applied in cases where defendant has come

forward with substantial evidence of incompetence to stand trial. This contention is correct. ▮ The recent United States Supreme Court decision in *Pate* v. *Robinson, supra,* 383 U.S. 375, compels us to revise our interpretation of section 1368 of the Penal Code so that it complies with the requirements of due process of law. (U.S. Const., Amend. XIV.)

In *Pate* v. *Robinson* the court reviewed on collateral attack, that is on habeas corpus, an Illinois murder conviction (see *People* v. *Robinson,* 22 Ill.2d 162 [174 N.E.2d 820]) and held that defendant Robinson had presented at his trial sufficient evidence of mental incompetence to entitle him to a hearing on present sanity as a matter of right under the due prcoess clause. That evidence consisted of testimony by three of Robinson's close relatives and one family friend relating various acts of Robinson several years before the trial which suggested mental illness.[7] Two of the witnesses, Robinson's mother and aunt, stated that in their opinion he was insane at the time of trial. His grandfather and the family friend testified that they considered him to be insane at unpredictable periods of time. It was also brought out that he had spent several weeks in a mental hospital some eight years before trial. But he was recovered from his illness when discharged and about two years later was adjudged sane in a restoration proceeding. It was stipulated at Robinson's murder trial that a psychiatrist who had examined Robinson had found him sufficiently sane to stand trial. In affirming Robinson's conviction, the Supreme Court of Illinois had held that the

---

[7]Robinson had been struck in the head by a brick at age seven and thereafter, according to his mother, '''acted a little peculiar.''' He once kicked a hole in the family bar for no apparent reason. He was sullen and frequently complained of headaches. He had been in many fights and had murdered his own infant son. He became "noticeably erratic" when in the Army. His mother observed him on occasions with a '''glare in his eyes''' and once found him pacing the floor saying something was after him. She had also observed him ''' a little foamy at the mouth.''' The family friend said that when she spoke to Robinson he either stared at the floor or looked at her ''glassy-eyed.'' Robinson's grandfather testified that Robinson was ''not right''—often walked abruptly away from his work and often appeared in a daze. Robinson once quarreled with his wife and threatened to burn her clothes. He became so unruly he tried to knock down a door, and police were called. The aunt testified that Robinson acted strangely and that she had seen him ''' 'stary-eyed' . . . , prancing, nervous, and 'just staring wild.''' Robinson also once feared someone was going to kill him.

Records from the Illinois mental hospital where he had been confined revealed that Robinson had been drinking heavily when admitted and that he had hallucinations of voices, snakes, elephants, and other animals. (*Pate* v. *Robinson, supra,* 383 U.S. 375, 378-382, 15 L.Ed.2d 815, 818-820; *People* v. *Robinson, supra,* 22 Ill.2d 162, 164-166.)

evidence did not "raise a *bona fide* doubt as to . . . [Robinson's] present sanity." (*People* v. *Robinson, supra,* 22 Ill.2d at p. 167.) It noted that the defense witnesses had based their conclusions that Robinson was insane or insane at times primarily on incidents occurring years before trial. Furthermore, the court noted, the record disclosed several instances during trial where Robinson displayed his ability to assist in his defense by making lucid and cogent legal arguments to the trial judge. (*Id.* at p. 168.)

The United States Supreme Court held that neither the stipulation that a psychiatrist had found Robinson sufficiently sane to stand trial nor Robinson's lucid comments during the trial offered a "justification for ignoring the uncontradicted testimony of Robinson's history of pronounced irrational behavior." (*Pate* v. *Robinson, supra,* 383 U.S. at pp. 385-386, 15 L.Ed.2d at p. 822.) "We believe," states the court's holding, "that the evidence introduced on Robinson's behalf entitled him to a hearing on this issue. The court's failure to make such inquiry thus deprived Robinson of his constitutional right to a fair trial." (*Id.* at p. 385, 15 L.Ed.2d at p. 822.)

*Pate* v. *Robinson* stands for the proposition that an accused has a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense. Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary.

When the evidence casting doubt on an accused's present sanity is less than substantial, *People* v. *Merkouris, supra,* 52 Cal.2d 672, 678-679, correctly states the rules for application of section 1368 of the Penal Code. Whether to order a present sanity hearing is for the discretion of the trial judge, and only where a doubt as to sanity may be said to appear as a matter of law or where there is an abuse of discretion may the trial judge's determination be disturbed on appeal. But, when defendant has come forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing as a matter of right under *Pate* v. *Robinson, supra,* 383 U.S. 375. The judge then has no discretion to exercise. Insofar as *People* v. *Merkouris, supra,* 52 Cal.2d 672, and *People* v. *Lindsey, supra,* 56 Cal.2d

324, suggest that the judge, because he personally has no doubt as to the accused's sanity, may deny a section 1368 hearing despite substantial evidence of present insanity, they are overruled.

Applying the rules compelled by *Pate* v. *Robinson, supra,* to the facts of the instant case, it appears beyond possibility of dispute that defendant presented substantial evidence of incompetence to stand trial. We note that the prosecution also presented substantial evidence that defendant was sane; however, once it is determined that defendant's showing was substantial, it is immaterial that the prosecution's evidence may seem more persuasive. The conflict can only be resolved upon a special trial before the judge or jury, if a jury is requested. (Pen. Code, § 1368.)

The diagnosis of Mr. Sussman, which he related on the stand while the judge was taking evidence to guide him in determining if he entertained a doubt of defendant's present sanity, was, by itself, substantial evidence which compelled the court to order a section 1368 hearing. If a psychiatrist or qualified psychologist (see *People* v. *Davis,* 62 Cal.2d 791, 798-801 [44 Cal.Rptr. 454, 402 P.2d 142]), who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied. Mr. Sussman so testified.

The People contend that Sussman was not qualified as an expert witness because he was not a medical doctor. In *People* v. *Davis, supra,* 62 Cal.2d 791, 800-801, we held that a psychologist is qualified as an expert witness on issues of legal insanity if he has training and experience in abnormal psychology. Mr. Sussman, with approximately nine years' experience in the state hospital system as a clinical psychologist, was so qualified. Any doubts about his qualifications that might be raised by the fact that he had only a masters degree, not a doctorate, were dispelled by his record of experience. Sussman's diagnosis was particularly relevant because he had worked with defendant in Atascadero State Hospital several years prior to trial. As we said in *Davis,* ''Whether a psychologist qualifies as an expert on sanity in a particular case depends on the facts of that case, the questions propounded to the witness, and his peculiar qualifications.'' (62

Cal.2d at p. 801; see also Note 78 A.L.R.2d 919; Code Civ. Proc., § 1870, subd. 9; 19 Cal.Jur.2d, Evidence, § 293, p. 20.)

In any event, Dr. Larson was a medical doctor and psychiatrist of long experience, and his testimony constituted evidence of present insanity as substantial, if not more so, than Sussman's. It is immaterial that Larson's testimony was given after the trial judge denied the motion for sanity hearing, because section 1368 requires him to consider all evidence of present insanity presented to him prior to sentencing and to order a hearing on his own motion if the evidence raises a doubt of the accused's competence to stand trial.

At the oral argument of this case the People urged that the proceedings conducted by the judge when he took evidence to aid him in deciding if a doubt of defendant's sanity existed constitute the "hearing" on the issue of competence to stand trial which *Pate* v. *Robinson* requires. (383 U.S. at p. 385, 15 L.Ed.2d at p. 822.) We disagree. In *Robinson*, where the United States Supreme Court found a violation of due process of law in failure to conduct a hearing on present sanity, the Illinois trial judge had also taken certain evidence the only purpose of which could have been to guide him in determining if a doubt of Robinson's competence to stand trial existed.[8] The distinction between a complete hearing to decide if an accused is competent to stand trial and special proceedings conducted by a judge to determine whether he should declare that a doubt of the accused's present sanity exists is well recognized in this state. (*People* v. *Westbrook,* 62 Cal.2d 197, 204 [41 Cal.Rptr. 809, 397 P.2d 545] ; *People* v. *Ashley, supra,* 59 Cal.2d 339, 363.) The decision of the United States Supreme Court in *Pate* v. *Robinson*

[8]In *Robinson* the defense had made no specific motion for a sanity hearing, but under Illinois law the trial judge was required to order a hearing on his own motion if a bona fide doubt of the accused's sanity arose. (*People* v. *Robinson, supra,* 22 Ill.2d 162, 167.) The opinions of Robinson's mother and aunt that he was insane at the time of trial and the stipulation that a psychiatrist had found Robinson sufficiently competent to stand trial were not relevant to Robinson's M'Naughton insanity defense. It is apparent that the Illinois trial judge took these and various other statements in evidence to guide him in determining whether he ought to order a present sanity hearing on his own motion.

*Pate* v. *Robinson* cannot be distinguished on the ground that the Illinois law and procedure differ from our own rules as stated in *People* v. *Merkouris, supra,* 52 Cal.2d 672, 678-679. The two are practically identical. (Compare *People* v. *Robinson, supra,* 22 Ill.2d 162, 166-167, and Ill. Rev. Stat. (1936) ch. 38, § 104-2 (referred to in *Pate* v. *Robinson, Robinson, supra,* 383 U.S. 375, 385, 15 L.Ed.2d 815, 822) with *People* v. *Merkouris, supra,* 52 Cal.2d 672, 678-679, and Pen. Code, § 1368.)

demonstrates that the type of "hearing" which due process requires when the accused has come forward with substantial evidence of present insanity has not been accorded the accused when the judge merely takes evidence to guide him in determining if he should declare the existence of a "doubt." A "hearing" is generally understood to be a proceeding where evidence is taken to the end of determining an issue of fact and a decision made on the basis of that evidence. (E.g., *State* ex rel. *Ellis* v. *State Road Com.*, 100 W.Va. 531 [131 S.E. 7, 8].) Such a full hearing on the present sanity issue, manifestly the type of hearing the United States Supreme Court was referring to, is provided for by section 1368 of the Penal Code and was erroneously denied to defendant Pennington in the instant case.

 That error requires reversal of judgment here. Under section 1368 of the Penal Code the trial court has no power to proceed with the trial once a doubt arises as to the sanity of the defendant. In trying defendant without first determining at a hearing his competence to stand trial, the court both denied to defendant a substantial right (*People* v. *Westbrook, supra*, 62 Cal.2d 197, 204; *People* v. *Jackson*, 105 Cal.App.2d 811, 815-816 [234 P.2d 261]) and pronounced judgment on him without jurisdiction to do so. In such cases the error is *per se* prejudicial. Nor, as the United States Supreme Court specifically held in *Pate* v. *Robinson, supra*, 383 U.S. 375, 387, 15 L.Ed.2d 815, 823, may the error be cured by a retrospective determination of defendant's mental competence during his trial.

The judgment in its entirety is reversed.

Traynor, C. J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

MOSK, J.—I dissent.

The majority misapply *Pate* v. *Robinson* (1965) 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836], to this case, which is factually dissimilar in crucial respects.

In *Pate* the Supreme Court was obviously influenced by the unanimity of testimony concerning defendant's mental condition. Reference was made repeatedly to the "*uncontradicted* testimony of four witnesses called by the defense" (p. 378, 15 L.Ed.2d p. 818); to the "*uncontradicted* testimony of Robinson's history of pronounced irrational behavior" (pp. 385-386, 15 L.Ed.2d p. 822); to the fact that the prosecution

introduced only a stipulation which contained *no finding of sanity* (p. 383, 15 L.Ed.2d p. 821); to the prosecutor who "seemingly admitted [that] . . . the facts presented to the trial court . . . could not properly have disposed of the issue of Robinson's competence" (p. 386, 15 L.Ed.2d p. 822). (Italics added.)

By contrast, the defendant in the instant case offered only the testimony and affidavit of one witness, and here it was the defendant who necessarily conceded in his brief that the People presented "to be sure, substantial and impressive evidence . . . that appellant was sane."[1]

Although, as I indicate hereafter, we may not reweigh the facts upon which the trial court acted, I shall comment briefly *in order not to appear to acquiesce in the majority's tenuous* interpretation of the evidence.

The defendant's sole expert was a psychologist. He was not a psychiatrist, held no M.D. or Ph.D. degrees. He had treated defendant seven years before the trial, observed him one morning in the courtroom during this trial, and interviewed him for no more than 15 minutes the same day. He gave no tests and consulted with no psychiatrist or other qualified expert.

In appraising the opinion of the psychologist, the court had before it for comparison and contrast the reports of Dr. George Abe, an M.D. and superintendent of Metropolitan State Hospital, the reports of three court-appointed psychiatrists, the court's own observation of the defendant during the trial, and evidence relating to defendant's conduct from December 31, 1964, to January 11, 1965. If we are to reweigh the evidence before the trial court, we must conclude that the People's presentation was infinitely more formidable.

But we have no power to reweigh the medical evidence here. The procedure of section 1368, compelling a cessation of the trial and an immediate sanity hearing, is to be invoked only if *the trial court itself* entertains a doubt concerning defendant's ability "to understand the nature and purpose of the proceedings taken against him and to conduct his defense in a rational manner." (*People* v. *Merkouris* (1959) 52 Cal.2d 672, 678 [344 P.2d 1], cert. den. 361 U.S. 943 [4 L.Ed.2d 364, 80 S.Ct. 411]; *People* v. *Jensen* (1954) 43 Cal.2d 572, 576

---

[1]The majority attempt to fortify their conclusion on the Penal Code section 1368 issue by quoting from testimony of Dr. Larson and Dr. Kaplan. This is of dubious value to us, since both witnesses testified later in the trial, not at the time the court expressed no doubt about defendant's ability to conduct his defense.

[275 P.2d 25].) The doubt may not be that of an enterprising defense counsel, nor of a reviewing tribunal which has had no opportunity to set eyes upon the defendant; rather, the doubt must arise in the mind of the trial court.

*Pate* is authority for the proposition that it is a denial of due process for a trial court to refuse arbitrarily to consider *uncontradicted* testimony of lack of capacity. But neither *Pate* nor logic suggests that a reviewing court can vicariously inject a doubt in the mind of the trial court when none in fact exists after the trial court has given reflective consideration to *conflicting* evidence on this issue.

*People* v. *Merkouris* (1959) *supra,* is controlling and persuasive under these circumstances. Yet the majority in elastically trying to apply *Pate* to this case not only emasculate *Merkouris,* but belatedly find it unconstitutional in application.

I would adhere to the following rationale of *Merkouris*:

"The 'doubt' referred to in section 1368 of the Penal Code, requiring a determination of a defendant's sanity if doubt arises during the pendency of the action or prior to judgment, is doubt in the mind of the trial judge, rather than in the mind of counsel for the defendant or any third person. [Citation.]

"The determination of a motion for a hearing upon the issue of a defendant's sanity at the time of trial is one which rests within the sound discretion of the trial court. [Citations.] It is only where as a matter of law a 'doubt' may be said to appear or where there has been an abuse of the discretion that is vested in the trial judge, in the determination of the question, that the conclusion of the latter may properly be disturbed on appeal. [Citation.] . . .

" [T]he evidence on the subject of defendant's sanity was highly conflicting and, together with the trial judge's personal observation of defendant, was sufficient to support his conclusion that he did not have a doubt as to defendant's sanity at that time." (52 Cal.2d at pp. 678-681.)

Due process is clothed in no particular raiment and assumes no exclusive form. Basically it contemplates a reasonable opportunity to be heard before an uncommitted agency. Once defense counsel raised the issue of defendant's ability to understand the nature and purpose of the proceedings taken against him and to conduct his defense in a rational manner, the trial court properly proceeded to appoint three psychiatrists to assist him and heard the defendant's presentation.

This having been done, due process was satisfied; compliance therewith was not absent merely because the court, having expressed that it "never had any doubt, does not now have any doubt as to defendant's sanity," did not thereafter invoke section 1368. The procedure adopted here was identical with that approved by this court in *People* v. *Ashley* (1963) 59 Cal.2d 339, 363 [29 Cal.Rptr. 16, 379 P.2d 496].

I would affirm the judgment.

McComb, J., concurred.

Respondent's petition for a rehearing was denied May 24, 1967. Mosk, J., and Burke, J., were of the opinion that the petition should be granted.