Filed 1/29/14  P. v. Denton CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sierra)

----

| | |
|---|---|
| THE PEOPLE, | C072568 |
| Plaintiff and Respondent, | (Super. Ct. No. CR02937X) |
| v. | |
| STEVEN ANTHONY DENTON, | |
| Defendant and Appellant. | |

Defendant Steven Anthony Denton pled no contest to arson in exchange for dismissal of an on-bail/own recognizance allegation as well as dismissal of case No. CR02911X (felony vandalism).  The court granted probation for a term of five years and ordered defendant to register as an arson offender.

Defendant appeals.  A certificate of probable cause was obtained.  Defendant contends the trial court lacked jurisdiction to accept his plea and enter judgment because there was a doubt as to his competence. We disagree and affirm.

1

## FACTS

On April 29, 2012, a brush fire burned one-eighth of an acre, a wooded area with heavy forest undergrowth, near the Loyalton Senior Apartments. No one was injured and no structures were damaged. According to witnesses, defendant had been seen in the area before the fire started. Based on prior contacts, deputy sheriffs knew that defendant suffered from mental illness and had exhibited violent behavior. Later that evening, deputy sheriffs located defendant, transported him to the substation and, after having advised him of his rights pursuant to *Miranda*,[1] interviewed him. Although defendant initially denied any involvement in the fire, he eventually admitted that he caused the fire: " 'I tried to put the fire out. It was an accident; I didn't do it on purpose. . . . I wanted to camp out . . . . I'm sorry it caused such a big fire.' " He denied setting other fires: " 'No, I have not. That was just an accident fire, today; I was afraid to tell the truth, I was afraid of the consequences.' " He also stated many times that he tried to extinguish the fire and that he had lit a small twig and the fire just grew. When he was told he was being arrested for arson, defendant initially resisted being handcuffed but once secured, he cooperated.

## DISCUSSION

Defendant contends the trial court lacked jurisdiction to accept his plea and enter judgment. He argues the trial court had a mandatory duty to suspend criminal proceedings and institute Penal Code[2] section 1368 proceedings. We reject defendant's contention, finding no substantial evidence in the record to create a reasonable doubt that defendant was unable to understand the proceedings or to assist counsel in the conduct of a defense in a rational manner.

---

[1]    *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

[2]    All further section references are to the Penal Code.

2

# I

## *Standard Of Review*

The prohibition against trying a mentally incompetent defendant "is fundamental to an adversary system of justice." (*Drope v. Missouri* (1975) 420 U.S. 162, 172 [43 L.Ed.2d 103, 113].) The competency test is " 'whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding --- and whether he has a rational as well as factual understanding of the proceedings against him.' " (*Dusky v. United States* (1960) 362 U.S. 402 [4 L.Ed.2d 824, 825].)

"State constitutional authority is to the same effect. [Citation.] [¶] The applicable state statutes essentially parallel the state and federal constitutional directives." (*People v. Lightsey* (2012) 54 Cal.4th 668, 691.) Section 1367 provides in relevant part: "(a) A person cannot be tried or adjudged to punishment while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." A defendant is presumed to be mentally competent to stand trial. (§ 1369, subd. (f).) If a doubt arises in the mind of the judge as to the mental competence of the defendant, the judge shall suspend the criminal proceedings and order that the question of the defendant's mental competence be determined at a hearing after the defendant has been examined by an appropriate expert appointed by the judge. (§§ 1368, 1368.1, 1369.)

Even if the judge believes the defendant is competent based on the judge's own observations, the judge must, on the court's own motion, declare a doubt and suspend proceedings when the court becomes aware of substantial evidence of mental incompetence. (*People v. Pennington* (1967) 66 Cal.2d 508, 518; *People v. Jones* (1991) 53 Cal.3d 1115, 1153.)

3

"[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." (*Drope v. Missouri, supra*, 420 U.S. at p. 180 [43 L.Ed.2d at p. 118].) " '[M]ore is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or *such diagnosis with little reference to defendant's ability to assist in his own defense*.' " (*People v. Davis* (1995) 10 Cal.4th 463, 527, italics added.) A court considers all relevant circumstances as well as counsel's opinion. (*People v. Howard* (1992) 1 Cal.4th 1132, 1164.)

When substantial evidence exists, the judge has no discretion on whether to order a competency hearing. (*People v. Superior Court* (*Marks*) (1991) 1 Cal.4th 56, 68-69.) If the judge fails to do so, the judge has acted in excess of his or her jurisdiction, depriving the defendant of a fair trial and rendering that resulting judgment a nullity. (*Id.* at pp. 70-71.)

II

*Procedural Background*

At the April 30, 2012, arraignment on the complaint, public defender J. Lon Cooper was appointed and defendant entered a not guilty plea. The court ordered an assessment at "Alta Sierra Center" (Alta), noting defendant's special mental health and medical needs and the requirement of supervision. There is no reporter's transcript of this proceeding, only case history notes.

4

On May 9, 2012, the probation officer filed a bail report recounting defendant's family history, employment history, and other information which was obtained from defendant's social worker and confirmed by defendant's mother. With respect to defendant's family history, defendant's mother was "abused by his father on a regular basis" and defendant probably "witnessed this on multiple occasions." As far as employment, defendant "worked a number of small jobs" and "[a]s long as he was taking his medications, he reportedly performed quite well." Under other information, the probation officer recounted that defendant suffered brain trauma twice, the first time when he was four years old (fell from a second story balcony) and the second time when he was 14 years old (hit by a car). He was also sexually abused when he was in second grade and as a result, he attempted suicide by hanging. When he was 15 years of age, he shot and killed his nine-year-old brother when they were playing with a loaded firearm. Defendant was not charged but it was never confirmed whether it was an accident. Defendant started experiencing auditory and visual hallucinations when he was 14 and was diagnosed as a schizophrenic when he was 15. He has attempted suicide more than 10 times, the latest in February 2012, having never recovered from his brother's death according to his mother. At 18, he started living on his own and was placed in housing in Loyalton. Defendant has had psychotic episodes and has been in a mental hospital six times in the last five years, staying from two weeks to five months each time. Defendant's mother "doesn't think [defendant] fully comprehends the court process. She says he realizes he is in trouble but otherwise does not understand what is happening in court or what the consequences are. His social worker says that he responds best to very short and direct questions, but is easily confused by compound/complex questions. His IQ is approximately 62. That being said, his mother did say he received a high school diploma through the special education program." Based on defendant's social history, it was the probation officer's opinion that it was a "tragic case" and that defendant should remain in custody or possibly be released to a locked mental facility.

5

On May 11, 2012, defendant appeared with attorney Cooper who advised the court that defendant would waive his right to a preliminary hearing. The court found that defendant understood and waived his rights and held him to answer. Again, there is no reporter's transcript of this proceeding, only case history notes.

At the May 25, 2012, arraignment on the information, defendant appeared with Cooper who waived formal reading of the information, *commenting that defendant "understands what the charges are,"* and advisement of his rights and consequences, and entered a not guilty plea on defendant's behalf. (Italics added.) Cooper advised that time was not waived and that he needed an assessment in order to assist defendant: "[Defendant] is waiting to get an assessment. And, really, in terms in which I can assist my client, I have to get that assessment. I don't know why it has taken weeks and weeks and weeks. But it needs to be done in terms of his possible placement. He is tired of sitting and waiting around in jail, and I don't blame him. *And I also need a chance -- in terms of fully comprehending what he comprehends, it is a real fine line as to whether he is clear about what is going on. So I'm not comfortable with that. So we need an assessment.*" (Italics added.) The prosecutor noted that "if counsel is concerned about whether or not the defendant is understanding what is going on, a 1368 is appropriate, and get this suspended until we get a report." Cooper responded that he was "aware of the statutory vehicles" he could use but that "an assessment would be helpful" to him and that he did not want to "just assume that this is the appropriate thing to do . . . ."

At a pretrial conference on June 8, 2012, the parties discussed a time waiver for purposes of completing the "psyche evaluation." Cooper stated, "I have talked to [defendant] somewhat. I do believe he understands the significance of a time waiver, which is no time waiver. I think he is capable of entering a time waiver today for a limited period. We have discussed the details. He is in custody . . . I believe he is willing to waive time to [July 18]. I suggest that date, because he met with someone out at the California Regional Services for a couple of hours. They interviewed him, and his

6

[p]syche evaluation is for June 26. I would like to have the benefit of the information obtained in that, so it would assist me." The court confirmed with defendant that he understood his right to a trial within 60 days, and that he waived his right until July 13 (the first law and motion date after June 26).

At the pretrial conference on July 13, 2012, due to a "Sheriff's office problem," defendant was not transported to be personally present but was in custody and attended via video conference. Defendant stated that he could hear the judge and would let the judge know when he could not hear, and responded "[g]ood" when asked how he was doing. Cooper had "just been handed a copy" of a "*letter* from Alta California Regional Center," (italics added) not an "assessment," which indicated that defendant qualified for their services. Cooper noted that the prosecutor was "not particularly happy about the way this case is proceeding." Cooper knew that an evaluation was scheduled for June 26, had spoken with Alta about the assessment, and "fully expected" to appear with defendant personally present and with the assessment in hand, commenting if he thought he "needed to do more to get that, [he] would have done so." The prosecutor expected more than a letter as well. Cooper also noted that defendant had entered a limited time waiver but "we can't keep doing that," and that Cooper "still ha[d] nothing in front of [him] that helps [him] *assess that this is a possible 1368 situation . . . , being taken out of the criminal system to deal with [defendant's] issues*." (Italics added.) The prosecutor concurred with Cooper's evaluation of the case and that Cooper needed the "[p]syche assessment to know what is going on with [defendant]," noting that "Human Services got involved in this early on."[3] Cooper commented that he needed something in writing in

---

[3] The prosecutor may have been referring to the fact that on April 24, 2012, after a felony vandalism offense (prior to the arson offense), the court "ordered that the defendant undergo a Department of Developmental Disability Assessment at the defendant's cost at the direction of John Hiatt, Sierra County Human Services Adult Protection Social Worker."

order to "feel comfortable saying to [defendant], do you want to waive time." Cooper requested that the matter be set for trial and that a "pre-probation report" be prepared to "assist us . . . and maybe by the time our next pretrial is set, we will have . . . this assessment, whatever it is." Cooper also stated that "we need all the information for [defendant] that we can get" but that defendant did not "have an issue" with further county time and then placement with Alta "because he has special needs." The prosecutor did not object to a "pre-plea" report, noting that "people got involved in this that shouldn't get involved, to the detriment of [defendant]." Defendant confirmed that he understood that he had the right to go to trial within 60 days and that he needed to "move ahead" with the case. Defendant agreed to a trial date of September 5, 2012, with the next pretrial on July 27 with the court's assurance that he would be transported and personally present. The court directed probation to prepare a "pre-plea report" by July 27. The court apologized to defendant that he was "not here today, you are supposed to be." Defendant responded, "I know. I thought so too. The time came and I couldn't come to court," and thanked the court for its apology.

In the preplea report filed July 24, 2012, the probation officer summarized not only the facts underlying the arson but also those underlying a felony vandalism offense which occurred on February 14, 2012. Defendant was caught on video kicking a vending machine at a market, causing extensive damage (approximately $1,000). When asked about the incident, defendant stated: " 'I was out last night riding my bike. I was in a bad mood last night so I took it out on the Coke machine. I know it was wrong and I am very sorry. . . . I don't know why I did it but I have been feeling this way for the past two days. I have not been taking the medication; I know I am supposed to take it. I kicked the machine several times with my feet, then the lights went out in the machine and I left. I was not trying to steal money from the machine. I just wanted to damage it.' "

The probation officer also reported that on July 16, 2012, she obtained a copy of the psychological evaluation performed on defendant by Jeffrey Miller and completed on

8

June 26, 2012, noting that the "*primary purpose of the evaluation was to assess the defendant's intellectual and emotional functioning*, his adaptive behavior skills in order to clarify his diagnosis, assist in the determination of his eligibility for Regional Center Services, and make recommendations concerning treatment and residential placement." (Italics added.)  The probation officer reported that Miller diagnosed defendant as having "Schizoaffective Disorder, Posttraumatic Stress Disorder, Mild Mental Retardation with a full scale IQ of 53, Dependent Personality Traits, Posttraumatic Brain Injury, Seizure Disorder, Von Willebrand Disease, Hypertension, and Polycystic Kidney Disease." The probation officer included Miller's recommendations:  "That the defendant access *individual psychotherapy and medication management focused on improving impulse and anger control*; upon release he should be placed in a care home or residential facility and should not live independently at this time; and that he participate in a vocational training program or a day program for developmentally disabled adults."  (Italics added.)  The probation officer reported that *Miller's evaluation "did not address if the defendant has the ability to understand and participate in the court process due to his mild mental retardation with an IQ of 53*" and did not address what threat level defendant poses to society.  (Italics added.)  The probation officer did not attach Miller's evaluation and the same does not appear in the record on appeal.

The probation officer noted that on July 17, 2012, she spoke with Alta's service coordinator supervisor about defendant's eligibility under the "category of mild retardation," the residential facility recommended defendant's placement, and the likelihood of defendant qualifying for the placement within 60 days.

The probation officer also stated that when defendant did not take his "psychotropic medications as prescribed, he engages in behaviors that have resulted in the law violations pending before the court."  The probation officer considered it "problematic" whether to recommend either probation or prison "[w]ithout a determination as to the defendant's ability to understand and participate in the court

9

process" as well as the risk he posed to society if released. It was the probation officer's opinion that it was "questionable" whether defendant had the ability to understand terms and conditions but that "medication compliance" (defendant took Abilify, lithium, and Haldol) was "critical" and noted that when he took his medications, "[h]is behavior is under good control."

On July 27, 2012, defendant entered his plea to arson. The court meticulously reviewed the plea agreement with defendant, as well as defendant's written plea form, and defendant responded appropriately to all questions. Cooper stated that defendant took "a number of medications" but Cooper felt defendant "*clearly understands what he is doing today*," having discussed it with defendant and that the "medications would not affect his ability to comprehend what is happening here today." In defendant's plea form, reference is made to Miller's evaluation dated June 26, 2012, for the list of medications. Defendant confirmed that he heard what Cooper said and agreed that the medications he was taking did not affect his ability to understand. Cooper confirmed that he was satisfied that defendant understood his rights, defenses, and consequences of the case.

On August 2, 2012, defendant was placed at a home care facility in Sacramento. Alta's service coordinator supervisor advised probation that they were "lucky" to obtain placement for defendant who now had a felony arson conviction with which he was not eligible for Alta's diversion program which guarantees two years of services paid completely by Alta. Without diversion, defendant would receive only eight mental health sessions through the county mental health but paid for by Alta. Alta hoped that defendant's felony could be reduced to a misdemeanor so that he could be enrolled in diversion. The probation officer recommended probation.

At sentencing on September 14, 2012, defendant appeared and was not in custody. Cooper confirmed that there was no legal cause why judgment should not be imposed. Cooper commented that his concerns were the defendant's "special needs" but Cooper was "satisfied, from talking to [defendant], that he is happy with the placement where he

10

is" and that he is "getting counseling, as instructed" and "wants to be successful with his probation." Defendant had nothing to add. The court then granted probation. In discussing factors related to defendant, the court noted "[w]hile the defendant's IQ is 53, he appears able to understand when given simple basic directives." An Alta representative stated that defendant would receive help to register as an arson offender but noted that such registration "will slow his admission to any placement or any care home for him." Defendant confirmed that he understood the terms and conditions of probation as stated by the court and confirmed that he agreed to be bound by them. When asked if he had any questions about how he appealed after the court explained it, defendant responded, "Not right now." Defendant confirmed that he understood how to appeal.

In a letter to Cooper dated October 22, 2012, after sentencing, an Alta intensive intervention specialist explained that defendant wanted to appeal, claiming defendant did not "understand what he was doing," and after sentencing, "was unable to explain what had just gone on in his hearing or in any of the previous hearings." The specialist also claimed that defendant was "unable to explain what it meant to register as an arsonist or what the result could potentially be if he didn't comply with his conditions of probation." The specialist stated that Alta "is concerned that [defendant] was not competent to stand trial and was therefore, not competent to issue a plea or accept a plea agreement." Based on defendant's low IQ and impaired memory, the specialist opined that "it is highly unlikely that he would have been able to understand the criminal proceedings or the consequences of any plea agreements he was being offered." *The specialist stated, "When concern about his competency was brought to your attention . . . , you reported . . . that you felt [defendant] understood enough to go forward with his case.*" (Italics added.) The specialist attached a note purportedly written by defendant stating that he wanted to appeal and claiming he did not understand what he was doing when he entered his plea.

11

## III

### *The Court's Ruling*

Defendant contends the trial court's mandatory duty to suspend criminal proceedings and institute section 1368 proceedings was "first triggered at arraignment" when Cooper stated that he was not sure that defendant understood and that he needed an assessment. Defendant claims the trial court was next alerted when the preplea probation report stated that defendant's IQ was 53 (which raised a question about defendant's competency) and that the psychological evaluation did not address the issue. Defendant claims Cooper's opinion that defendant understood when he entered his plea "did not relieve the court of its duty to suspend proceedings in light of the substantial evidence before it that [defendant] was significantly developmentally disabled and suffering from multiple mental disorders."

At arraignment, Cooper stated that defendant understood what the charges were but Cooper wanted the previously ordered assessment to ensure that defendant was "clear about what is going on." That defendant's IQ level of 53 indicated mild retardation did not negate the fact that, according to his social worker, defendant understood short and direct questions. Defendant also received a high school diploma through a special education program. When defendant entered his plea he responded appropriately to all questions and defense counsel felt that defendant "clearly" understood the plea proceedings, his rights, defenses, and consequences. At sentencing, Cooper noted that defendant was "happy" with his placement. Defendant confirmed that he understood the terms and conditions of probation and agreed to them. That an Alta specialist was of the opinion over a month after sentencing that defendant had not understood when he entered his plea and was sentenced does not change the evidence in the record which reflects just the opposite. It is defendant's present ability at the time of trial and prior to judgment that is significant in any competency determination. (*Dusky v. United States, supra,* 362 U.S. 402 [4 L.Ed.2d 824]; see also § 1368, subd. (a).) Although defendant had a

12

developmental disability, he obtained his high school diploma and understood short and direct questions. He had a mental disorder but the evidence indicated that as long as he took his medications, there were no behavioral problems. We conclude that no substantial evidence was presented indicating defendant's inability to understand the proceedings or to rationally assist Cooper in the conduct of the case.

DISPOSITION

The judgment is affirmed.


                                                     ROBIE              , J.


We concur:


        BLEASE           , Acting P. J.


        MAURO           , J.