Filed 11/25/15  P. v. Jones CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAVID LEE JONES,<br><br>        Defendant and Appellant. | A140717<br><br>(Napa County<br>Super. Ct. No. CR165475) |

Defendant David Jones was convicted of four felonies:  three counts of criminal threats (Pen. Code, § 422)[1] and one count of stalking (§ 646.9).  He contends all counts must be reversed, his sentence vacated, and a new trial held because the trial court failed to conduct an inquiry into his competence to stand trial, despite substantial evidence that objectively raised a doubt as to his competence.  He also contends all four counts were unsupported by substantial evidence.  Defendant's arguments are meritless, and we affirm.

**EVIDENCE AT TRIAL**

**The Parties**

James Pryor and his girlfriend of nine years, Joy Hale, lived together in American Canyon.  Pryor and defendant, who lived in Vallejo, had been friends for about 16 years.  Pryor was also friends with Joseph Fowler, who considered Pryor his "adopted uncle."

---

[1] All subsequent statutory references are to the Penal Code.

1

**The Incidents Involving Fowler**

After being introduced to defendant by Pryor in October 2012, Fowler moved into an apartment defendant shared with his girlfriend. One night in December 2012, Fowler woke up and found defendant standing nearby, staring at him. Fowler asked what he was doing, but defendant did not answer, continuing to stare at him for two or three minutes. Defendant then went outside to have a cigarette, and Fowler joined him. Defendant finished his cigarette first and went back inside, followed later by Fowler. Fowler went into the bathroom, where he found defendant standing in the dark with a knife in his hand and the bathroom window open. Fowler asked him what he was doing, and defendant told him not to worry about it and left the room. The next day, defendant told Fowler he was not in his right mind because he had been doing drugs and had thought about killing his girlfriend and escaping through the bathroom window.

Two days later, there was a "violent incident" that prompted Fowler to move out of the apartment. Defendant and his girlfriend got into a "huge fight," she "left for a little bit" and defendant "just went crazy" and "took off, started hiding from people." When he came back, he threatened Fowler with a knife, telling him, "[G]et the fuck out of my house, you traitor." Fowler immediately left the apartment and moved in with Pryor and Hale. Fowler returned a couple of days later to retrieve his belongings, bringing some friends with him because he was afraid to go back.

Shortly after Fowler moved in with Pryor and Hale, he was involved in a car accident that left him wheelchair-bound with his leg in a boot. During the time he was confined to the wheelchair, defendant occasionally visited the house to see Pryor. Defendant would wait until Fowler was alone and then threaten to "kick [his] ass" or beat him up once he was out of the wheelchair. Fowler estimated that defendant threatened him at least 11 times. Defendant would also walk by Fowler and punch him on his injured leg. On multiple occasions, defendant brandished a knife at Fowler, telling him the knife was waiting for him when he got out of the wheelchair and that he was going to stab him. At first, Fowler did not think anything of the incidents, but then he started to worry.

By March 2013, Fowler no longer needed the wheelchair. One night, he went out to dinner with his grandmother. She had invited a few of her friends to join them, one of whom was defendant. When defendant showed up and saw Fowler, he said, "[O]h, you're walking now. I'll see you tomorrow." Fowler was concerned because defendant had been threatening to beat him up once he was out of the wheelchair. During the time Fowler had known defendant, defendant carried a knife with him most of the time.

**Threats Made Via Text Messages**

On March 13, 2013, Hale and Pryor were home when they received a call from defendant on a cell phone they shared. Pryor answered the call, and defendant told him to give papers that defendant had left at Pryor's house to defendant's Aunt Vicki. He hung up after threatening Pryor that he would kill him if he did not turn over his daughter's papers.

Pryor repeatedly attempted to call defendant back, and when defendant would not answer, Pryor sent him a text message that read, "fuck you." Pryor and Hale immediately received the following texts from defendant:

"Jimmy I will take ur life and u will be missing forever do not fuck with my daughters money give it to Vicki like you said u would I will be in Vallejo and all who thinks there bad I will show you who's the bitch 30 seconds or less cour is Tue b ready bitch"

"We will see who gets fucked punk" (3:36p.m.)

"Carl u joy Joey"[2] (3:37 p.m.)

"Check it homie last chance give my daughter's life to Vicki" (3:38 p.m.)

Pryor and Hale went to the police station and filed a police report. They were both scared by the texts, and they wanted to establish that there was an ongoing problem because defendant had previously stolen their car.

After they returned home, defendant sent them a second series of texts:

---

[2] Carl was a mutual friend of Pryor and defendant. Joey was Joseph Fowler.

"U still from my daughter and make a police report ur a nigger piece of shit rat" (6:40 p.m.)

"Just like David sr at co . . ."

"Call the cops birch IM still gonna get ur punk ass" (6:49 p.m.)

"U should of just stayed out of my business like I did yours n u allowed people to do so I would never do that to u in a million years call the cops there not gonna save ur life"

"U made ur choice no I IM just gonna do wat u cowards can't do" (6:56 p.m.)

"Honesty and loyalty is the hardest thing to face in life" (6:56 p.m.)

"IM not scared of shit bitch I will go to all means nigger for my daughter and u know it bitch I have nothing to say u ducked up when Susan left because of u Joey Carl and ur AIDS infested bitch now it's my business you made it that way fuck u nigger IM gonna set u on fire alive u and ur punk ass friends want to play God with my life well the table has turned IM God know bitch"

"U allow your friends to make shit up and ruin my life so me n my homebody r Gonna take yours period u know what Carl joy and Joey were doing the whole time fuck you bitch IM not gonna have mercy on u like u didn't for me"

Pryor testified that after receiving the texts, he "was worried about what [defendant] was going to do": "I didn't know—I don't know how crazy he was. You know what I mean. He was off the hook. I don't know how to explain it. I don't know. I was scared." He also described his feelings as "[n]ervous, worried. I mean every night I go park my car two blocks from my house, which in turn means—and two—two blocks isn't real far to walk, but I mean he'd stolen my car in the past, and I was worried he was going to do it again. And I didn't know what else he was going to do. [¶] . . . He just wasn't acting right."

Hale believed defendant was referring to her when he said, "ur AIDS infested bitch," which made her feel "[i]rritated, angry, . . . scared." She believed "if [defendant] had been right there he would have done exactly what he said," which was to hurt them.

4

According to Hale, defendant "wasn't balanced" and she had seen a "progression over the past few months" that led her to believe he would carry out his threats.

Hale also described a Facebook message defendant had sent sometime before he sent the text messages. She had posted "something on [her] wall on [her] Facebook page, and [defendant] had left a nasty message underneath it, uncalled for, but we defriended him from all our accounts." Before they "defriended" him, they saw another message that defendant had sent to Pryor in which he said, according to Hale, "he could find him anywhere, stab him, find him anywhere, at the home, at the hospital, in Sacramento . . . ."

Pryor and Hale were scared because they did not know where defendant was when he sent the texts, and they were relieved upon learning he had been taken into custody. Hale also testified that she would still be afraid of defendant if he were released because "he has a temper" and "[h]e pretty much always carries a knife."

Pryor and Hale also showed the texts to Fowler, who then reported to the police the threats defendant made to him. He was concerned for his safety and felt like he needed protection because defendant had threatened that he was going to burn him alive. At the time, he did not know where defendant was, although he later learned from Hale and Pryor that he was in custody on this case. From the time he read the text messages until he learned defendant was in custody, Fowler was frightened because he thought defendant was capable of doing the things he threatened in the texts. As Fowler testified, "I've talked to a lot of people that know him, and they say that he's not a safe person to be around when he's angry."

## PROCEDURAL BACKGROUND

By criminal complaint dated March 28, 2013, the District Attorney of Napa County charged defendant with three counts of stalking (§ 646.9, subd. (a)) and three counts of making criminal threats (§ 422). It was also alleged that defendant had a prior strike (§§ 459, 667, subds. (b)–(i)), a prior serious felony (§§ 459, 667, subd. (a)(1)), and a prison prior (§ 667.5, subd. (b)).

At defendant's May 24 arraignment, the court observed that defendant was facing "a substantial amount of time" (18 years, eight months) and asked if he would like to

5

have an attorney appointed to represent him. Defendant responded, "I don't know." The court informed him he could represent himself but that it was "advisable" to have an attorney, especially when facing "so many years of prison time." After defendant again responded, "I don't know," the court stated it would appoint him counsel. The matter was then set for a preliminary hearing.

On June 5, the day before the preliminary hearing, the public defender's office declared a conflict, and the court suggested continuing the matter so a new defense attorney could be located. Defendant refused to waive time, however, so the matter was put off only long enough to locate counsel, at which point the court proposed continuing the matter for a week so counsel could prepare for the preliminary hearing. Defendant objected that he was being deprived of his right to a speedy trial and stated that he wanted his former attorney back. When defendant's new counsel said he needed a week of preparation in order to provide effective assistance, the court explained to defendant that his prior attorney could not represent him and if he insisted in proceeding with the preliminary hearing at that time, his only option was to represent himself. Despite the court urging him not to do so, particularly in light of how much time he was facing, defendant insisted on representing himself at the preliminary hearing.

The court informed defendant that if he represented himself, he would be required to comply with the rules of criminal procedure and evidence, would not be afforded special treatment, would be opposed by an trained prosecutor, and would be removed from the courtroom if he was disruptive. And if he subsequently decided to retain counsel, the court might not continue the matter to allow his attorney time to prepare. Defendant responded that he had graduated from high school and was competent to represent himself. The court found that he "knowingly, intelligently, and voluntarily is deciding to represent himself with full knowledge of the risks and dangers of doing so" and granted him permission to proceed in propria persona. Defendant signed a *Faretta*[3]

---

[3] *Faretta v. California* (1975) 422 U.S. 806.

warnings form, although next to his signature he wrote, "I did not get to see this for myself."

Defendant proceeded to ask the court if the matter was on for a pretrial hearing, to be released on his own recognizance, and to see the evidence against him, believing that the prosecution had to represent all of the witnesses, evidence, and "all that other stuff" against him at the preliminary hearing. When the court explained how the preliminary hearing would function, defendant responded, "Okay. Thank you." He also inquired about the discovery he had not received and access to a law library.

The preliminary hearing was held the following day. At the outset, the court confirmed that defendant had decided to represent himself. Defendant responded, "I was forced to," claiming he had to represent himself in order to have a speedy trial. The court inquired of defendant what he meant by his notation on the *Faretta* warnings form, to which defendant responded, "[T]he Judge told me here's the form. The Bailiff said sign it, and then sent me out of the room. When they came into the holding tank, you have two seconds to sign it, and I have to give it back. And I said I haven't read it." In light of this claim, the court took a recess to afford defendant an opportunity to read the *Faretta* warnings and asked him a series of questions to confirm his understanding of the warnings and the risks of self-representation. Defendant confirmed his understanding by responding, "Yes, sir" to each question.

The court also confirmed with defendant that he had not prepared for the preliminary hearing and had not received discovery delivered to the jail by the prosecutor the prior afternoon. As the court put it, "[Y]ou don't have a lawyer, and you don't have the police reports, you would rather do the preliminary hearing today, representing yourself, than waive time, have the attorney represent you, and be able to do this hearing in a few days to a week with an attorney representing you . . . .?" Despite that the court labeled this "a pretty poor decision," defendant responded, "Yes, your Honor."

The preliminary hearing then proceeded, with defendant doing, as the court would later describe it, "a fairly decent job" at representing himself. At the conclusion of the hearing, the court held defendant to answer the charge of stalking Fowler and all three

7

criminal threats charges (one each as to Fowler, Hale, and Pryor). Indicating that trial would be in mid-August, the court again inquired of defendant whether he would like to have an attorney appointed, since an attorney would have time to get up to speed without compromising defendant's right to a speedy trial. Defendant responded, "No, they can give me life. I didn't do this. I don't want an attorney. I didn't do this." The court countered, "[N]ow you have to decide whether you want to act emotionally, and because you're mad, and represent yourself, or if you want to act logically and consider the value of having a lawyer represent you." Defendant answered, "Napa County can do whatever they want. I'll represent myself."

On June 10, an information charged defendant with stalking Fowler and making criminal threats against Hale, Pryor, and Fowler, and again alleged a prison prior, a prior serious felony, and a prior strike. When the matter came on for arraignment on the information, it was continued because defendant was "medically unavailable."

At a continued arraignment on June 24, the court asked defendant whether he still wanted to represent himself or would prefer to have an attorney appointed. Defendant responded, "Um, I would like—due to my medication, I wasn't on my medication when I did this, and now that I'm on my medications, they did the Depakote level, and I'm not capable of representing myself." The court confirmed that defendant wanted a lawyer, referred him for the appointment of conflict counsel, and continued the matter with no time waiver. After counsel was appointed, defendant pleaded not guilty on all counts, and the matter was set for trial, a date later continued at defendant's request. At a subsequent pretrial hearing, both sides agreed to waive their right to a jury trial, although the record is silent as to why.

On August 28, 2013, defendant's counsel moved the court for funds for clinical and forensic psychologist Richard Geisler, Ph.D., to conduct a psychological test and examination of defendant. In the motion, defense counsel informed the court: "According to Mr. Jones's records and statements he has made to me, it appears that from the age of nine until the present, he has been diagnosed with a number of mental disorders, including attention deficit/hyperactivity disorder, schizoaffective disorder

8

(bi-polar type) and depression; that he has been prescribed such psychoactive drugs as Ridilin [*sic*], Prozac, Depecote [*sic*], Lithium, Geodone and Respirdol [*sic*]; that he has abused morphine, Vicodin and Valium; that he has been confined within locked mental health wards in Solano and Sacramento Counties and that he attempted suicide while confined within the California Department of Corrections, one month before he was to have been paroled. Therefore, a salient issue presented in the case is whether Mr. Jones formed and acted upon the required specific mental states when he allegedly engaged in the conduct that forms the basis of the charges against him."[4] The court granted the motion, and Dr. Geisler conducted an evaluation of defendant.

A bench trial took place on October 15, 2013, with Hale, Pryor, and Fowler the only witnesses. After the court heard evidence, it found defendant guilty on all four counts and found the special allegations to be true.

Prior to sentencing, defendant filed a *Romero*[5] motion to strike his prior strike and a motion for new trial on the ground that there was insufficient evidence of his guilt. Dr. Geisler testified at length in support of defendant's *Romero* motion, which testimony was as follows:

Dr. Geisler interviewed defendant in July and August 2013, after which he prepared a report summarizing his evaluation of defendant. In the report, he described defendant's "affect" as "full range and congruent." He explained that this meant defendant "showed a variety of emotions during my interview with him that were appropriate to the topic at hand. I think he probably smiled when it was appropriate. He was serious when the conversation called for it. He was sort of sad when talking about some of the past problems he's had." He also described defendant's mood as "moderately dysphoric," which meant depressed.

According to Dr. Geisler, defendant was diagnosed with attention deficit hyperactivity disorder at the age of seven, for which he was prescribed Ritalin and

---

[4] Notably, defense counsel did not express any concern about defendant's present competency.

[5] *People v. Superior Court (Romero)* 13 Cal.4th 497, 529–530

9

underwent counseling. He started smoking marijuana when he was eight years old, and was institutionalized the following year for eight months, returning after his release on an outpatient basis for three years of counseling. When he was 12 years old, he attempted to kill his younger brother and neighbor and was sent to juvenile hall.

Defendant began using methamphetamine sometime between the ages of 12 and 15. When he was 16 years old, he stopped taking Ritalin, left the care of his mother, and went to live with his father, a methamphetamine manufacturer with whom defendant took drugs. Defendant claimed that when he was young, the methamphetamine worked to calm him down like the Ritalin had, unless he used too much. He developed a dependence on it, however, which caused mental and physical problems and contributed to the deterioration of his personal relationships and occupational endeavors. While he primarily abused methamphetamine and marijuana, he also used heroin while in prison. Despite defendant's chronic drug use, he had never received substance abuse treatment.

Dr. Geisler testified that after defendant was released from state prison in 2012, he received psychiatric treatment from the Department of Corrections and Rehabilitation's parole outpatient clinic. He was diagnosed with bipolar disorder and anti-social personality disorder and was treated with Lithium and Depakote (both mood stabilizers). Dr. Geisler believed defendant suffered from a combination of anti-social personality disorder and borderline personality disorder, describing how the combination can lead to problems with impulse control and judgment. In addition, defendant had a substance abuse disorder. According to Dr. Geisler, "the interaction of those three [conditions] . . . was instrumental in this particular case."

Defendant also received psychiatric treatment while in custody in Napa County, when he was again diagnosed with bipolar disorder and treated with Lithium, Depakote, and Risperdal (an anti-psychotic). Dr. Geisler believed defendant was treated with Risperdal because he had reported hearing voices at various times. Dr. Geisler also believed defendant responded well to Lithium and Depakote, and likely Risperdal, noting that historically he had an amelioration of symptoms when he was on those medications.

10

Dr. Geisler believed it was possible defendant may have been suffering from psychoses leading up to the incidents in March 2013. He engaged in "some very bizarre behavior that . . . could have been the product of psychotic thinking," citing the incident when Fowler found defendant in the bathroom with the knife.

Defendant told Dr. Geisler that in January of that year—2013—he had tried to commit suicide by hanging himself from a fruit tree, an attempt that was unsuccessful because someone intervened. Dr. Geisler also noted in defendant's jail records that defendant had mentioned suicide attempts, including thoughts in May 2013 that he might try to kill himself. Defendant also reported having experienced auditory hallucinations, including while he was in custody in this case. He reportedly heard the voice of his fiancée, although he did not hear voices encouraging him to harm himself or others. While in custody in June 2013 (the same month defendant was "medically unavailable" for his arraignment), defendant banged his head against the county jail wall in an attempt to commit suicide and stop pains in his head. He was moved to a safety cell and put on 15-minute interval watch.

Dr. Geisler administered tests to measure defendant's cognitive functioning. One test, which he described as "a general estimator of a level of intellectual functioning" that "can be administered fairly quickly," registered an I.Q. of 83, which put defendant in the 13th percentile of the general population, with a likely I.Q. in the range of 75 to 91. The test had a "fairly good reliability and validity to it," although it was not considered to be as definitive a measure as a Wexler exam. Defendant performed well on a neurobehavioral cognitive status examination, although his results on a general screening test for neuropsychological symptoms showed "some possible abnormalities in his visual perceptual skills . . . ." The court interrupted Dr. Geisler's testimony at this point to interject that defendant's I.Q. as Dr. Geisler reported it was "somewhat inconsistent" with how well he conducted himself during the preliminary hearing, having done, in the court's words, "a fairly decent job" at representing himself.

Dr. Geisler continued with his testimony, noting that on a depression inventory which measures depression levels, defendant scored "extremely high," indicating "he

11

probably has a very severe depression going on at that time." While Dr. Geisler acknowledged that individuals in custody often experience depression, defendant's result was "one of the highest scores" he had ever seen. Defendant reported feelings of worthlessness, self-loathing, extremely low self-esteem, pessimism, and vegetative signs consistent with severe depression.

Defendant acknowledged to Dr. Geisler that he did threaten to harm Pryor, claiming he wanted to scare him into returning documents and a safe deposit key he was holding. He denied threatening or stalking Fowler, however. And he said he did not intend to do anything after making the threats.

Dr. Geisler was of the opinion that defendant was addicted to methamphetamine and marijuana, and suffered from bipolar disorder with psychotic symptoms. He considered the possibility that defendant was legally insane at the time he committed the offenses, but he did not express a belief that that was the case. At no time did Dr. Geisler suggest defendant was incompetent to stand trial.

After hearing further evidence, the court denied defendant's *Romero* motion, as well as his motion for new trial. It then sentenced defendant to seven years, eight months in state prison.

Defendant filed a timely appeal.

## DISCUSSION

### The Record Does Not Contain Substantial Evidence that Objectively Raised a Doubt as to Defendant's Competence to Stand Trial

In his first argument, defendant contends the trial court had a sua sponte duty to conduct a hearing to determine whether he was competent to stand trial. Its failure to do so, he submits, deprived him of due process. We disagree.

Section 1367 prohibits the prosecution of an individual while that person is mentally incompetent, defining mentally incompetent as "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner" as a result of a mental disorder or developmental disability. (Accord, *Dusky v. United States* (1960) 362 U.S. 402 [test for mental competence to stand trial is

12

"whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."].)

Section 1368 requires a court to hold a hearing on present sanity "[i]f, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant . . . ." (§ 1368, subd. (a).) Once substantial evidence of incompetence has been offered, "a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary." (*People v. Pennington* (1967) 66 Cal.2d 508, 518.) "Although section 1368, subdivision (a), refers to a doubt that arises 'in the mind of the judge as to the mental competence of the defendant,' case law interpreting this subdivision establishes that when the court becomes aware of substantial evidence which objectively generates a doubt about whether the defendant is competent to stand trial, the trial court must on its own motion declare a doubt and suspend proceedings even if the trial judge's personal observations lead the judge to a belief the defendant is competent." (*People v. Castro* (2000) 78 Cal.App.4th 1402, 1415; see also *People v. Hayes* (1999) 21 Cal.4th 1211, 1281; *People v. Stiltner* (1982) 132 Cal.App.3d 216, 222–223; *People v. Humphrey* (1975) 45 Cal.App.3d 32, 36–37.)

The court in *People v. Burney* (1981) 115 Cal.App.3d 497, 503, expanded on the concept of substantial evidence in this context:

"What constitutes substantial evidence in a proceeding under section 1368 cannot be answered by a simple formula applicable to all situations. [Citation.] Where there is no substantial evidence to raise the required doubt in the mind of the trial judge the failure to proceed under section 1368 *sua sponte* is not error. More is required to raise a doubt than mere bizarre actions, or bizarre statements, or statements of defense counsel that defendant is incapable of cooperating in his defense, or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense. [Citation.] It is not

13

enough that an expert state that the defendant is mentally ill or insane to satisfy the substantial evidence test. [Citation.] The expert must state with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel. [Citation.] However, a single doctor's report which concludes that the defendant is incapable of standing trial, even in the face of other reports to the contrary, is substantial evidence requiring that a section 1368 proceeding be instituted. [Citation.]" Here, there was no substantial evidence objectively raising a reasonable doubt as to defendant's competence to stand trial.

From the outset of the case, defendant demonstrated an understanding of the nature of the proceeding,[6] evidenced by his refusal to waive time for his preliminary hearing, acknowledgement of the self-representation advisements at the hearing, demand to see the evidence against him, request to be released on his own recognizance, acknowledgment of the different burdens at a preliminary hearing than a trial, and inquiries regarding access to a law library. Additionally, his courtroom demeanor was appropriate, devoid of outbursts, and replete with polite and respectful responses to the court.

Defendant also, in the words of the trial court, "did a fairly decent job" representing himself at the preliminary hearing. He successfully asserted, and opposed, objections and conducted reasonably skillful cross-examination for a layperson. He knew that a witness could be cross-examined with prior convictions. He made an oral motion for dismissal based on a claim that he was denied due process because he was not served with discovery. And he evidenced an understanding of the concepts of relevance, hearsay, leading questions, and vagueness.

At the hearing following the preliminary hearing, defendant demonstrated his understanding of the nature of the proceeding by informing the court that, now that he

---

[6] This is not to say that defendant understood the procedural intricacies, which understanding often only comes with years of experience as a practicing attorney.

14

was taking his medication, he wanted to be represented by counsel. He was able to contribute to his defense by confirming his desire to withdraw his 60-day waiver for trial, and later consenting to a continuance and waiving time again. He knew the difference when he was represented by substitute counsel at a subsequent hearing, and when faced with a term he did not understand ("zealous" advocate) he sought clarification of what the term meant.

On the other hand, there is no evidence in the record that defendant was unable to understand the nature of the proceedings or assist his counsel in his defense. He identifies no evidence that he experienced hallucinations or delusions during trial that impeded his defense. There is no evidence that he refused to cooperate with his trial counsel. There is no evidence of outbursts during trial. Dr. Geisler described in detail defendant's mental struggles but never suggested he did not understand the nature of the proceeding or lacked the ability to aid in his own defense. Dr. Geisler considered the possibility that defendant was legally insane at the time he committed the offenses, but he expressed no belief that defendant was incompetent at the time of trial. Again, *People v. Burney, supra,* 115 Cal.App.3d at p. 503 is apt: "It is not enough that an expert state that the defendant is mentally ill or insane to satisfy the substantial evidence test. [Citation.] The expert must state with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel." Dr. Geisler offered no such opinion here.

Defendant cites five factors that he claims, "individually and collectively, raised a doubt about [his] competence to stand trial, which required the court to order" a section 1368 hearing: (1) multiple suicide attempts; (2) depression; (3) psychotropic medication; (4) litigation concessions contrary to his interest; and (5) his pre-existing mental illnesses. But the mere existence of these factors—assuming they were all present—does not compel a conclusion that there existed an objective doubt as to defendant's mental competence. Without something to suggest that these factors rendered defendant incapable of understanding the proceeding or assisting in his own

15

defense, there was no basis for the court to order a competency hearing. As the California Supreme Court stated in *People v. Laudermilk* (1967) 67 Cal.2d 272, 285: "[M]ore is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation]."

Defendant also discusses at length three Ninth Circuit cases he considers "highly instructive." We do not find them persuasive. Two cases, *Moran v. Godinez* (9th Cir. 1992) 972 F.2d 263 (*Moran I*) and *Moran v. Godinez* (9th Cir. 1994) 57 F.3d 690 (*Moran III*) involved a defendant (Moran) who, following a suicide attempt, confessed to killing three people, including his ex-wife. (*Moran III, supra,* at p. 694.) Faced with three counts of capital murder, Moran discharged his counsel, changed his plea to guilty, refused the court's offer of standby counsel, and announced that he wanted no mitigating evidence presented on his behalf at sentencing. The court asked if he was taking drugs and he replied that he was on medication, but the court asked no follow up questions. When advised about his legal rights and the charges against him, Moran responded to questions in monosyllabic responses. He was ultimately sentenced to death. (*Moran I, supra,* at p. 264.)

Moran's subsequent claim that he was not legally competent to waive his right to counsel or enter guilty pleas eventually made its way to the Ninth Circuit, which agreed the record did not support a conclusion that Moran was competent to make a valid waiver of constitutional rights. (*Moran I, supra,* 972 F.2d at p. 264.) The court reasoned as follows: "[T]here was substantial evidence available at the time [defendant] pled guilty to trigger a good faith doubt about his competency to waive constitutional rights. Moran had attempted suicide only a few months before his plea hearing. In addition, Moran stated at the plea hearing that he wanted to fire his attorney to ensure that no mitigating evidence would be presented on his behalf at sentencing. [Citation.] The transcript of the plea hearing shows that virtually all of Moran's responses to the court's questions

16

were monosyllabic. Furthermore, at the time he discharged his counsel and changed his pleas to guilty, Moran was taking four different kinds of medication: Inderal, Dilantin, Phenobarbital, and Vistaril. [Citation.] Although the transcript shows that Moran advised the court that he was taking medication, no further inquiry was made on this subject. [Citation.] [¶] Given the record in this case, the state court should have entertained a good faith doubt about Moran's competency to make a voluntary, knowing, and intelligent waiver of constitutional rights." (*Id*. at p. 265.)

*Moran I* does not stand for the proposition that evidence of a defendant's prior suicide attempts, drug use, or depression is sufficient to trigger a trial court's sua sponte duty to hold a competency hearing, as defendant apparently believes. Rather, the critical issue there, and one that distinguishes the outcome from this case, was that Moran eschewed the presentation of a defense, possibly as a consequence of the medications he was taking, but the court never made any inquiry into the medications. By contrast, defendant's medication here appeared to aid him in participating in his defense, since he refused counsel while off his medication but requested counsel—and presumably followed his counsel's advice—after he resumed taking his medication. This is consistent with Dr. Geisler's testimony that defendant historically responded well to the medications he was taking. And there was no evidence that defendant took any action out of a desire to forgo a defense; to the contrary, defendant maintained his innocence and repeatedly insisted on invoking his right to a speedy trial.

*United States v. Howard* (9th Cir. 2004) 381 F.3d 873, also relied upon by defendant, provides no greater assistance. There, defendant's counsel presented him with a plea bargain on the morning trial was set to begin. Defendant was taking Percocet, a prescription narcotic pain killer, for a leg injury. During the colloquy at the plea hearing, the court asked defendant if he was under the influence of alcohol or a narcotic drug. Defendant responded, "No," but when the court noted a hesitation, defendant went on to explain he was taking Percocet for pain pursuant to a doctor's order. When that court asked, "That's pretty tough stuff, isn't it?", defendant responded, "The pain I am going

17

through is pretty tough." Without conducting any further inquiry regarding the drug or its effects, the court accepted defendant's guilty plea. (*Id.* at p. 876.)

Defendant appealed from the district court's denial of his habeas petition claiming that his counsel's performance was ineffective in permitting him to enter into the plea agreement while he was incompetent. (*United States. v. Howard, supra,* 381 F.3d at p. 875.) The Ninth Circuit reversed, agreeing that the district court should have held an evidentiary hearing on the question of defendant's competency. (*Id.* at p. 881.) In addition to citing defendant's representation to the district court that he was a taking Percocet, which the judge recognized was "strong" medication, the court cited defendant's subsequent sworn statement in support of his habeas petition that because of the medication, he was " 'incapable of understanding the nature and consequences of his plea,' " he suffered from " 'mental clouding,' was so befuddled he was unable to count, was 'incoherent' and 'almost devoid of sensible meaning' in his speech, was not 'in full possession of his mental faculties,' was 'narcoticized' and 'did not fully understand the nature and consequences of his agreement.' " (*Id.* at p. 880.) This, the court concluded, raised a question of whether defendant was competent such that an evidentiary hearing was required. (*Id.* at p. 881.) Here, there was significant testimony from Dr. Geisler concerning defendant's medications, none of which suggested they impeded his mental abilities. Indeed, the evidence was to the contrary.

Defendant also details what he describes as the "leading cases" on the issue of a defendant's present competence, each of which held that the trial court's failure to inquire into defendant's competence or to hold a competency hearing deprived defendant of his right to a fair trial. But in those cases, there was objective evidence that defendant was incapable of understanding the nature of the proceedings against him or of assisting in his defense, evidence that was missing here. (See *Pate v. Robinson* (1966) 383 U.S. 375, 378–383 [defendant suffered severe head trauma as a child, "had a long history of disturbed behavior," "appeared in a daze, with a 'glare in his eyes,' and would not speak or respond to questions"; presented symptoms of mental illness; heard voices and saw hallucinations; experienced serious "irrational episodes"; attempted suicide by shooting

18

himself in the head after shooting and killing his young son; four lay witnesses were of the opinion that defendant was insane]; *Drope v. Missouri* (1975) 420 U.S. 162, 165–170 [psychiatric report described defendant as " 'markedly agitated and upset' " with difficulty in relating, " 'markedly circumstantial and irrelevant in his speech,' " and " 'a very neurotic individual who is also depressed' "; defendant was diagnosed with a sociopathic personality disorder, sexual perversion, borderline mental deficiency, and chronic anxiety reaction with depression; defendant's wife testified that defendant and four friends raped her and "subject[ed] her to other bizarre abuse and indignities"; defendant choked his wife a few days before trial; on the second day of trial, defendant shot himself in the abdomen; two psychiatrists testified that there was reasonable cause to believe defendant might not be competent to stand trial]; *People v. Pennington, supra,* 66 Cal.2d at pp. 508, 511–514 [defendant repeatedly interrupted trial with obscenities and comments; he declared midtrial that he did not want an attorney; defense counsel advised the court that defendant was unable to cooperate with him and requested a hearing on defendant's sanity; two psychologists and a psychiatrist testified that they believed defendant was incompetent to stand trial in light of hallucinations and delusions he experienced at the time of trial; defense counsel observed defendant crying in his jail cell with abrasions on his wrists; defendant displayed his penis to courtroom spectators and invited them to come to the trial and bring Cracker Jack].)

In short, nothing in the record suggests that at any time during these proceedings defendant was unable to understand the nature of the proceedings or to assist counsel in conducting the defense in a rational manner.

### Substantial Evidence Supports the Court's Guilty Finding on All Three Criminal Threat Counts

Defendant next challenges the sufficiency of the evidence to support his convictions, beginning with a claim that there was insufficient evidence he made criminal threats against Fowler, Pryor, or Hale. The crime of criminal threat is set forth in section 422, which provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent

19

that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." A violation of section 422 consists of the following five elements: (1) defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances. (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228, quoting § 422; see also *In re Ryan D.* (2002) 100 Cal.App.4th 854, 860; CALCRIM No. 1300.)

On a challenge to the sufficiency of the evidence to sustain a criminal conviction, "we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We ' "presume in support of the judgment the existence of

20

every fact the trier could reasonably deduce from the evidence." ' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 509.)  Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

When considering the sufficiency of the evidence to support a criminal threats conviction, we evaluate the totality of the circumstances, including the parties' prior contacts and the manner in which the communication was made, to determine whether the communication conveyed to the victim a gravity of purpose and an immediate prospect of execution of the threat.  (*In re Ryan D., supra,* 100 Cal.App.4th at pp. 859–860; *People v. Butler* (2000) 85 Cal.App.4th 745, 753–754; *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137; *People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.)

As to Fowler, defendant brandished a knife at him while calling him a traitor. This threat occurred two days after Fowler encountered defendant in a bathroom holding a knife and one day after defendant told Fowler that he was not "in his right mind" because he had been doing drugs and felt like he was going to murder his girlfriend. Later, when Fowler was confined to a wheelchair with his leg in a boot, defendant repeatedly hit him on his injured leg and threatened to beat him up, eventually threatening to stab him while again brandishing a knife.  On at least 11 occasions, defendant threatened to harm Fowler once he was no longer wheelchair-bound.  And once defendant saw that Fowler was able to walk again, he perpetuated his threats, telling him, "[O]h, you're walking now.  I'll see you tomorrow," suggesting he was going to make good on his threats.  This evidence alone was sufficient to support the criminal threats conviction as to Fowler.  But there was more.

The text messages defendant sent to the phone shared by Pryor and Hale likewise constituted substantial evidence that defendant made criminal threats to Fowler, as well as Pryor and Hale.  He mentioned all three victims by name several times, threatened to set them on fire alive and, in the case of Pryor, to take his life and show him "who's the bitch."  He threatened that he was "not gonna have mercy" and that the police were not

21

"gonna save ur life." The victims all testified they were fearful and took the threats seriously in light of defendant's history and unpredictable conduct, and were only relieved upon learning defendant was in custody. Again, this was substantial evidence supporting the three criminal threats convictions.

Defendant's chief complaint is that the texts did not satisfy the third element of a section 422 violation because they were, as he puts it, "written in an equivocal, conditional tone—i.e., *if* Pryor or Hale withheld from [defendant] valuable documents related to money intended for his daughter, *then* 'Jimmy, I will take ur life and u will be missing forever do not fuck with my daughter's money give it to Vicki like u said u would. I will be here in Vallejo and all who thinks there bad I will show u who's the bitch 30 seconds or less . . .;' and 'Check it homie last chance give my daughter's life to Vicki . . . .' " But this mischaracterizes what the texts actually said. The texts conveyed defendant's anger that Pryor and Hale apparently had in their possession important documents belonging to defendant, but he did not make the threats contingent on their failure to return the documents. This is especially true of the second set of texts, in which defendant expressed his anger that the victims had filed a police report based on the first set of texts and threatened them with violence: "Call the cops birch IM still gonna get ur punk ass"; "U should of just stayed out of my business like I did yours n u allowed people to do so I would never do that to u in a million years call the cops there not gonna save ur life"; "U made ur choice no I IM just gonna do wat u cowards can't do"; "IM not scared of shit bitch I will go to all means nigger for my daughter and u know it bitch I have nothing to say u ducked up when Susan left because of u Joey Carl and ur AIDS infested bitch now it's my business you made it that way fuck u nigger IM gonna set u on fire alive u and ur punk ass friends want to play God with my life well the table has turned IM God know bitch"; "U allow your friends to make shit up and ruin my life so me n my homebody r Gonna take yours period u know what Carl joy and Joey were doing the whole time fuck you bitch IM not gonna have mercy on u like u didn't for me." There was nothing conditional in these threats of violence.

22

Defendant also argues the record does not support a finding the victims were reasonably in "sustained fear" that defendant would harm them. Their testimony that they were all afraid until they learned he was in custody is substantial evidence of such fear.

Viewed in the light most favorable to the judgment, the totality of the circumstances contained substantial evidence that defendant made criminal threats against Pryor, Hale, and Fowler.

**Substantial Evidence Supports the Trial Court's Guilty Finding on the Charge of Stalking Fowler**

Lastly, defendant contends the prosecution failed to present sufficient evidence that he stalked Fowler. Again, this argument lacks merit.

The crime of stalking is set forth in section 646.9, which provides in pertinent part: "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking, punishable by imprisonment in a county jail for not more than one year, or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison." (§ 646.9, subd. (a).) "[H]arasses" means "engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose. (*Id.*, subd. (e).) "[C]ourse of conduct" means "two or more acts occurring over a period of time, however short, evidencing a continuity of purpose," excluding constitutionally protected activity. (*Id.*, subd. (f).) "[C]redible threat" means "a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the

23

threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat." (*Id.*, subd. (g).)

The evidence showed that defendant threatened Fowler on multiple occasions, punctuated by hitting him on his injured leg or brandishing a knife. Fowler testified that after he moved in with Pryor and Hale, defendant repeatedly threatened to "kick [his] ass" or beat him up once he was out of the wheelchair. In Fowler's estimation, defendant threatened him in this manner at least 11 times. On multiple occasions, defendant brandished a knife, telling Fowler the knife was waiting for him when he got out of the wheelchair. And then when defendant discovered that Fowler was no longer wheelchair bound, he told Fowler, "[O]h, you're walking now. I'll see you tomorrow." This was sufficient evidence that defendant maliciously harassed Fowler and made a credible threat with the intent to place him in reasonable fear for his safety.

## DISPOSITION

The judgment of conviction is affirmed.

24

_____

Richman, J.

We concur:

_____

Kline, P.J.

_____

Stewart, J.

A140717; *People v. Jones*

25