Filed 2/5/16  P. v. Medina CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ROMMEL DAMIAN VASQUEZ MEDINA,<br><br>    Defendant and Appellant. | F069560<br><br>(Super. Ct. No. F13905859)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Cynthia L. Barnes, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

[*]    Before Levy, Acting P.J., Franson, J. and Peña, J.

Defendant Rommel Damian Vasquez Medina pled no contest to assault with a firearm (Pen. Code, § 245, subd. (a)(2))[1] and admitted a gang enhancement (§ 186.22, subd. (b)(1)). The trial court sentenced him to the middle term of three years in prison, plus a consecutive five-year term on the gang enhancement. On appeal, he contends the trial court erred by failing to conduct a competency hearing because it was presented with substantial evidence of his incompetence to stand trial. We affirm.

## BACKGROUND

On March 14, 2014, defendant entered his no contest plea with no indication of the sentence he would receive. The sentencing hearing was set for April 14, 2014.

On April 14, 2014, defense counsel stated he had not received the probation officer's report and thus could not complete the memorandum he wished to submit. The trial court noted it had received a fax from the Central Valley Regional Center (CVRC) and stated it wanted to confirm that everyone had received a copy. The court stated: "It's a letter and a psychological evaluation. The evaluation is old, but the letter is updated, and the letter questions whether [defendant is] competent." The court agreed to continue sentencing to May 12, 2014.

On May 9, 2014, defense counsel filed a statement in mitigation, asking the court to stay the gang enhancement and sentence defendant to the middle term of three years. The statement described defendant's background as follows:

> "[Defendant] was born [in] 1988 in Fresno, California. He has lived in California's Central Valley for most of his life with the exception of a brief stay in Utah from 2002 through 2003. In 2007, [defendant] was diagnosed as 'an individual who is functioning between mild retardation and borderline intelligence.' (See Exhibit A)

> "[Defendant's] low functioning resulted in an inability to hold down a steady job. [Defendant] reported that he was laid off from several jobs

---

[1] All statutory references are to the Penal Code unless otherwise noted.

because he was unable to remember what he was taught. Since that time, [defendant] has been a client of the [CVRC].

"Unable to succeed in school or hold down a job, [defendant] drifted toward gangs, alcohol and drugs. In 2011, [defendant] was placed on probation by Tulare County for narcotics violations."

The statement then set out an argument for mitigation of his sentence:

"[Defendant] continues to contend that he did not commit the assault to which he pled no contest. Based on the significant risk of proceeding to trial, however, [defendant] decided to accept the District Attorney's offer to resolve the case. [Fn. omitted.]

"Even assuming that [defendant] is guilty, several factors should operate to mitigate his punishment. [Defendant] lacks an extensive criminal history. He is mentally challenged and therefore an easy target of manipulation by his so-called 'friends' in the Norteno criminal street gang….[2] The Court could consider all of the above factors under [California Rules of Court, r]ule 4.413 as facts demonstrating unusual circumstances.

"The court should also view with skepticism some of the claims made by the probation officer in her report and recommendation. Other than the instant case there is no evidence that [defendant] 'has engaged in violent conduct'. Utilizing this as an aggravating factor is nonsensical as *every* assault with a firearm is—by definition—violent conduct. The probation officer uses the commission of the current crime as a factor to aggravate the punishment for the current crime, something that cannot be countenanced.

"Nor can it be said that [defendant's] prior convictions are 'numerous' as he has only two such prior convictions. And while assault with a firearm is arguably more serious than the narcotics violations for which [defendant] was on probation, the sample size is far too small to suggest that the 'increasing seriousness' of his criminal behavior is a factor in aggravation.

"Neither can the court properly use the dismissed counts as factors in aggravation. Each of the dismissed counts were alternative methods for charging the same conduct. The fact that the district attorney's office files

---

**2** Omitted here is a sentence lined out by the trial court when defense counsel explained he had made an error.

3

multiple charges criminalizing the same conduct does not aggravate the conduct that is charged.

"The Court can also consider the following factors in mitigation:

"[**California Rules of Court, r**]**ule 4.423(b)(2):** <u>The defendant was suffering from a mental or physical condition that significantly reduced culpability for the crime</u>:  As discussed above, [defendant's] mental health challenges provide a partial excuse for his conduct.

"[**California Rules of Court, r**]**ule 4.423(b)(5):** <u>The defendant made restitution to the victim</u>:  \*\*\*  [No information is referenced by these asterisks.]

"[**California Rules of Court, r**]**ule 4.423(b)(6):** <u>The defendant's prior performance on probation or parole was satisfactory</u>:  While probation uses the fact that [defendant] was on felony probation at the time the crime was committed as a circumstance in aggravation, the Court should note that [defendant] had successfully served just over two years of his three year probationary term.  He was not violated prior to his arrest for the instant offense."

Attached to the statement in mitigation were three documents—a fax cover sheet, a brief cover letter to the trial court, and a 2007 psychological evaluation of defendant.

The brief cover letter was from Jose Rodriguez, Counselor/Service Coordinator at CVRC, dated April 10, 2014.  It stated the following:

"The above named defendant was last seen before the court on 3/14/14. [Defendant] has been a client of [CVRC] since 2004.  Please note that [defendant] has been in Special Education classes since an early age and is diagnosed as Borderline Intellectual Functioning status through Sullivan Center for Children, therefore competency would be questionable according to current diagnosis.  Please find the enclosed Psychological Evaluation dated 12/21/2007 for your review."

The psychological evaluation was performed by Michael Kesselman, Ph.D. in 2007 when defendant was 19 years old.  Defendant had been referred for the psychological evaluation by CVRC "to assess his intellectual and adaptive level of functioning."  Kesselman observed:

4

"[Defendant] is neatly groomed and casually dressed. He is cooperative and puts forth a good effort. [He] is able to carry on a basic conversation. He speaks in both simple and complex sentences which are, for the most part, grammatically correct. [He] knows both Spanish and English but is more familiar with English."

The report stated that defendant's family began to notice he was slow and behind other children when he was six years old and starting school. Defendant told Kesselman that he lived with his mother and sister. He said he had never lived on his own and could not do so. He said he could cook simple foods like hamburgers or eggs, but not foods requiring cooking, mixing, and measuring. He had never learned to wash his clothes. He could not manage money or pay bills. He could sometimes count correct change from a purchase. He was able to walk around his hometown of Parlier, but did not take the bus. He got nervous around a lot of people. He had never had mental health counseling or taken any medications. He said he had had several jobs, but had been laid off from most of them. Employers did not understand why he could not remember what they told him to do from one day to the next. He said he would like to participate in a program to help him find a job.

Kesselman administered tests and came to the following conclusions:

"On the WAIS-III today, [defendant] obtained a Full Scale IQ of 67. This which would suggest mild retardation. However, three previous cognitive assessments have found borderline intelligence. Therefore, I have given [defendant] a provisional diagnosis of borderline intelligence. Consistent with a diagnosis of an individual who is functioning between mild retardation and borderline intelligence would be results from academic achievement scores.

"[Defendant] does appear to have a number of substantial handicaps. He has a substantial handicap in his learning, as measured by his academic achievement scores and low IQ scores. He has a substantial handicap in his capacity to live independently, as he is unable to cook anything but simple foods, cannot manage his money, does not always count the correct change, and is unable to get around his home town independently. Additionally, [he] is unable to wash clothes. [He] has a substantial handicap in his capacity for economic self-sufficiency. He has been laid off from several

5

of the jobs he has had after a short period of time. The employers get frustrated when [he] cannot remember from one day to the next what they have taught him.

"[Defendant's] relatively high score on the Street Survival Skills Questionnaire suggests he might benefit from an independent living program and might, in fact, be able to live independently. [He] does have some relatively good non-verbal skills. He might be taught some type of vocational task. I would consider working in conjunction with vocational rehabilitation as [he] may fit in better with individuals who are of borderline intelligence vocationally.

"Should the [CVRC] accept [defendant] as a client, 1 would consider re-evaluating [him] in three years or possibly sooner if the case worker has reports that [he] is able to live independently. He does seem to have this potential but is unable to do so now. 1 believe that this inability is due to cognitive deficits."

On May 13, 2014, the sentencing hearing took place and the following occurred:

"THE COURT: All right. We are on the record in the matter of [defendant]. Today is the date set for sentencing. The court has received and had an opportunity to review the report and recommendation of the probation department. I have also received and had an opportunity to review the victim impact statement … and have considered that. I have also received the statement in mitigation filed on behalf of [defendant] as well as the psychological evaluation from 2007 done by Mr. Kesselman and the note from Jose Rodriguez, the CVRC counselor service coordinator. [¶] … [¶]

"The recommendation in this matter is for nine years. That would be the aggravated term plus the five years for the 186.22(a) consecutive. The court has indicated in chambers a thought to give either seven or eight years in this matter, however, I'll hear from both counsel. [¶] [Defense counsel], you wish to be heard?

"[DEFENSE COUNSEL]: Yes. Thank you, Your Honor. [¶] … [¶] [T]he statement in mitigation references an Exhibit A which was not attached. The Exhibit A that was being referenced was the letter from CVRC which the court has referenced in its remarks and I just want to make that clear.

"THE COURT: Okay.

6

"[DEFENSE COUNSEL]:  Your Honor, with respect to the court's ruling I would just reiterate the points made in the statement in mitigation regarding the probation officer's analysis of this case.  The aggravating factors that are listed in this particular case are stretched at to get this.  You cannot use the aggravating factor that [defendant] has engaged in violent conduct which presents a danger to society because that's not aggravating to the crime which he has pled to.  The crime itself is the violent conduct.  You can't aggravate the crime by using the crime.  That's improper analysis by the probation officer.

"Furthermore, I think it is a stretch to suggest because [defendant] committed a more serious offense arguably than his narcotics offense out of Tulare County that he has a criminal history that is numerous or increasing in seriousness.  We have evidence of two distinct convictions that [defendant] has.  That's far too small of a sample size to make the comments that the probation officer makes, nor was it appropriate to—for the court to use the dismissed counts as an aggravating factor in this case because the dismissed counts were simply different ways of pleading the same conduct.  No counts were dismissed that aren't, in fact, part of the plea agreement with the possible exception of the personal use allegation, but that is, I think, part and parcel of the agreement anyway.  We all understand what [defendant] has pled to here.

"On the mitigating side of things, clearly [defendant] suffers from a mental condition.  It's set forth in the letter from CVRC the diagnosis from CVRC.  He's been receiving services from [CVRC] for several years.  And while I disagree with the letter suggesting that there are competency issues in this case, I think [defendant] understands what the nature of the charges are, understands the court proceedings and can effectively assist counsel in his own defense.  That doesn't go as far as to say that he is sufficiently sophisticated to engage in planning, to engage in the type of planning that would be involved in this particular incident.  And it is clear that to the extent that [defendant] was involved, he was involved as the patsy of his other so-called friends in the street gang who manipulated him and preyed upon him in order to get him to commit criminal conduct on their behalf, pretending to be friends of his, pretending to give, you know, give him a home in the place where he can feel accepted.

"I think it's striking that [defendant] made every effort in his young adult life to be a positive contributor to society.  He had several jobs.  He studied hard.  He worked hard at the [CVRC].  And in each one of his employment situations he was let go because he was unable to perform to

7

the level of expectations required of him due to his mental disabilities. The same thing happened at school.

"So what we see in [defendant] is a person who, through no fault of his own, has been marginalized, has been made to feel other[,] left out of society in the sense that he's not been able to contribute in a positive way, and he's been sort of left on the margins, and those unfortunately are the type of people that gang members prey upon. They give them a sense of belonging, a sense of community, a sense of family, a sense that they are valuable, and based on that induce them to committing criminal activity that otherwise they probably would not engage in.

"We discussed in chambers, and I will not make any further reference to the restitution that [defendant] has attempted to provide to the County of Fresno.

"And I would note that apart from this case [defendant] was performing well on the terms of his Tulare County probation. There were no violations. He did not appear to have dropped out of contact with probation or failed to report to his drug treatment for his drug treatment obligations. [¶] … [¶]

" … And finally, Your Honor, just noting that the basis for [defendant's] plea was for sentencing benefit. Clearly he was exposed to a significant amount of time in custody were he to have proceeded to trial and lost. [Defendant] steadfastly denies that he's the person who shot at [the victim]…. [¶] I would submit on those comments. [¶] … [¶]

" … Your Honor, the one comment that I would make with respect to the prior conviction is that it is commonly testified to by the detectives on the MAGEC unit that a tactic of street gangs, especially organized street gangs like the Nortenos in particular, is to utilize other people's houses for the placement of their guns and their drugs so as to deflect attention from themselves. While [defendant] did plead guilty to those charges and we cannot now argue that he has not been convicted of those charges, I would caution the court about how much weight to put on the facts of that case given that we don't know the basis for the search warrant in the case. We don't know exactly what [defendant's] role in this was other than that guns and drugs were found in the home of a gang member. And a gang member who has mental challenges and can provide those individuals with an easy—an easy mark and a good patsy for taking the fall for their cases, and I would submit on those comments and the comments of misstatement [*sic*] of mitigation. We're asking the court to sentence [defendant] to the mitigated term.

8

"THE COURT: Okay. Anything further?

"[PROSECUTOR]: No, Your Honor. Thank you.

"[DEFENSE COUNSEL]: Submitted, Your Honor.

"THE COURT: Okay. The statement in mitigation asked the court to stay or strike the gang enhancement punishment and sentence [defendant] to the middle term of three years. The court is not going to do that because it does seem to the court that it would be inappropriate for the court to stay or strike the gang enhancement in this case. [Defendant] participated in this—this shooting was purely a gang shooting. And it was against not a rival gang, but against a completely innocent individual who had the bad luck to wear the wrong color T-shirt. So unusual circumstances are required in this case for probation. The court does not find unusual circumstances to grant probation and so probation in this case is denied.

"The circumstances in aggravation that the court does find are that the defendant was [on] probation or parole when the crime—probation when the crime was committed. The facts of this case in the court's mind are particularly egregious. The gun was actually fired. The victim was actually injured. The statement that the victim wrote to the court details the difficulties that he now has as a result of the injuries that he sustained. The court will consider that as a factor in aggravation.

"With respect to factors in mitigation, the defendant did plead at an early stage although he denies any wrongdoing. The court does believe the defendant's diminished mental capacity are a factor in mitigation relating to the defendant, and the court will find therefore that the aggravating and mitigating circumstances are in balance.

"Sentence the defendant to the middle term of three years. The enhancement pursuant to 186.22(b)(1) is an additional five years. As I interpret that under 1192.7(a) this was a personal use of a gun and therefore it's a five-year as opposed to a two, three, four or a ten which are the other options that are available. So the addition of five years for a total of term of eight years."

## DISCUSSION

### I.    *Law*

Both the federal Constitution and our state statutes forbid criminal prosecution of a person who is mentally incompetent. (*Pate v. Robinson* (1966) 383 U.S. 375, 378;

9

§ 1367, subd. (a).) The constitutional test is whether the defendant "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" (*Dusky v. United States* (1960) 362 U.S. 402.) Similarly, state statutes forbid prosecution while the defendant, "as a result of mental disorder or developmental disability … is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

Section 1368 provides that, when "a doubt arises in the mind of the judge as to the mental competence of the defendant, [the judge] shall state that doubt in the record and inquire of [defense counsel] whether, in the opinion of [defense counsel], the defendant is mentally competent." (§ 1368, subd. (a).) If defense counsel then "informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing." (*Id.*, subd. (b).) When the court has ordered a hearing to make a determination into the defendant's competence, it must suspend the criminal prosecution until the question of the defendant's mental competence has been determined.[3] (*Id.,* subd. (c).)

The provisions of section 1368 have been interpreted to afford a constitutional right. If the judge makes an express declaration of doubt as to a defendant's competence, the court is *required* to hold a competency hearing and make a formal determination regarding the defendant's competence. (*People v. Marks* (1988) 45 Cal.3d 1335, 1340.)

---

[3]    "Although it arises in the context of a criminal trial, a competency hearing is a special proceeding, governed generally by the rules applicable to civil proceedings. [Citations.] A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence." (*People v. Lawley* (2002) 27 Cal.4th 102, 131.)

If the judge does not make an express declaration of doubt, but a defendant has nevertheless presented substantial evidence that he is incompetent, the court is similarly *required* to conduct a hearing and make a formal determination. (*People v. Hale* (1988) 44 Cal.3d 531, 539; *People v. Pennington* (1967) 66 Cal.2d 508, 518-519 (*Pennington*).)

"'Substantial evidence' has been defined as evidence that raises a reasonable doubt concerning the defendant's competence to stand trial." (*People v. Welch* (1999) 20 Cal.4th 701, 738.) Substantial evidence of incompetence may come from any source, and the trial court, in deciding whether substantial evidence of incompetence exists, "must consider all of the relevant circumstances." (*People v. Howard* (1992) 1 Cal.4th 1132, 1164; *Drope v. Missouri* (1975) 420 U.S. 162, 180.) "In *People v. Pennington, supra*, 66 Cal.2d at page 519, [the Supreme Court] enunciated the following standards regarding what would constitute substantial evidence of incompetence to stand trial: 'If a psychiatrist or qualified psychologist [citation], who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied.'" (*People v. Welch, supra,* 20 Cal.4th at p. 738.)

When substantial evidence appears, a doubt as to the defendant's competence exists, "no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary." (*Pennington, supra,* 66 Cal.2d at p. 518; see *id.* at p. 519 [defendant presented substantial evidence he was incompetent and prosecution presented substantial evidence he was competent; "however, once it is determined that defendant's showing was substantial, it is immaterial that the prosecution's evidence may seem more persuasive"; "conflict can only be resolved upon a special trial before the judge or jury, if a jury is requested"].) At this point, if the court proceeds with a criminal prosecution without first making a formal

11

determination that the defendant is, in fact, competent to stand trial, the defendant is denied his constitutional right to a fair trial. (See *People v. Ary* (2004) 118 Cal.App.4th 1016, 1020; see also *Pate v. Robinson, supra,* 383 U.S. at pp. 384-385.)

If, on the other hand, the evidence of the defendant's incompetence is less than substantial (and the court has not expressed a doubt as to his competence), the decision to conduct a hearing is in the trial court's discretion. (*Pennington, supra,* 66 Cal.2d at p. 518.) The court may first choose to hold further informal hearings to assist it in determining whether there is substantial evidence of incompetence. (*People v. Johnson* (1991) 235 Cal.App.3d 1157, 1162, citing *People v. Ashley* (1963) 59 Cal.2d 339, 363.)

When a trial court is required to make a formal competency determination, defense counsel cannot waive that determination on behalf of the defendant. (See *People v. Marks, supra,* 45 Cal.3d at p. 1340.) If a trial court fails to make a formal determination once it is required to do so, that court's order directing the reinstitution of criminal proceedings is an act in excess of its jurisdiction. (*Id.* at p. 1337.)

## II.    *Analysis*

In this case, the trial court did not express a doubt as to defendant's mental competence. Thus, the question here is whether the court was presented with substantial evidence of defendant's mental incompetence, such that the court was *required* to conduct a hearing a make a formal determination of his competence. (*People v. Hale, supra,* 44 Cal.3d at p. 539; *Pennington, supra,* 66 Cal.2d at pp. 518-519.)

Defendant asserts that the documents supplied by CVRC and attached to his statement in mitigation provided the necessary substantial evidence of his incompetence. We disagree.

In considering all of the relevant circumstances, the trial court was required to consider defense counsel's "undoubtedly relevant" opinion regarding defendant's competence. (*People v. Howard, supra,* 1 Cal.4th at p. 1164.) Defense counsel was of the unambiguous opinion that defendant was *competent* to stand trial. Counsel stressed

12

that the psychological evaluation he was presenting did *not* demonstrate defendant's incompetence, but was for the sole purpose of justifying the court's imposition of a mitigated sentence on the ground that defendant's lack of sophistication to engage in the planning required of this particular crime demonstrated that he had been manipulated and preyed upon to commit criminal conduct on behalf of gang members. Defense counsel specifically explained to the court that he did *not* believe defendant's mental condition rendered him incompetent, and that he believed defendant understood the nature of the charges and the court proceedings, and could effectively assist counsel in his own defense. Consequently, defense counsel's opinion did not raise any doubt as to defendant's competence to stand trial.

Furthermore, the content of the psychological evaluation itself did not raise a reasonable doubt concerning defendant's competence to stand trial. Kesselman observed that defendant was well groomed, cooperative, and made a good effort. He could speak two languages. He spoke in both simple and complex sentences and with generally correct grammar. He described himself as a 19 year old who lived with his family and did not know how to cook or wash clothes. He walked around town, but did not ride the bus and did not always count correct change. He had trouble learning and remembering what employers asked of him on previous days. He was interested in getting another job. Kesselman concluded defendant was provisionally borderline intelligent, and possibly mildly retarded. He scored relatively high on "Street Survival Skills" and had some relatively good non-verbal skills, such that he might be able to live independently in the future.

This evaluation in no way suggested that defendant's mental deficits were so great that he could not understand the nature of the criminal proceedings or rationally assist defense counsel in presenting a defense. Rather, it suggested that despite those deficits, at 19 years old, he was able to present himself in a favorable manner and communicate moderately well, and he was even likely able to live independently (which he may or may

not have done in the following seven years).  We also note that Kesselman's evaluation of defendant was not performed for the purpose of determining his competence to stand trial, a topic Kesselman never mentioned and which, if he had, would nevertheless have been outdated by seven years.  Kesselman's observations and conclusions regarding defendant's mental deficits, while certainly relevant to the court's consideration, were made to assess 19-year-old defendant's ability to live, work, and function on his own, not to assess 26-year-old defendant's ability to understand the nature of the criminal proceedings and rationally assist counsel in presenting a defense.[4]

We conclude there was no substantial evidence defendant was incompetent to stand trial.  Accordingly, the trial court was not required to conduct a competency hearing, and it did not abuse its discretion in declining to do so.  (*Pennington, supra,* 66 Cal.2d at p. 518.)

## DISPOSITION

The judgment is affirmed.

---

**4**     For that reason, many of Kesselman's observations, such as 19-year-old defendant's lack of domestic skills such as cooking or doing laundry, had little application to his competence to stand trial.